WIGGINS, Justice.
Former Warren County employees brought an action against the county and its board of supervisors alleging a violation of the open meetings law contained in chapter 21 of the Iowa Code. The district court dismissed the action, finding the board members’ activities did not constitute a “meeting” as defined in Iowa Code section 21.2(2) (2013)., In reaching its conclusion, the district court found that although the board members deliberated concerning matters .within the scope of their policy-making duties, a majority of the supervisors never deliberated at a meeting within the meaning of section 21.2(2). On appeal, we conclude the definition of meeting in section 21.2(2) extends to all in-person gatherings at which there is deliberation upon any matter within the scope of the policy-making duties of a governmental body by a majority of its members, including in-person gatherings ' attended by a majority of the members by virtue óf an agent or a proxy. Therefore, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.
I. Background Facts and Proceedings.
As' permittéd under the Iowa Code, a board of supervisors consisting of three elected board memb'ers governs Warren County (the county). See- Iowa Code § 331.201; At all times relevant to this appeal, the Warren County Board of Supervisors was comprised of board members Douglas Shull, Steve Wilson, and Dean Yordi. Prior to the events giving rise to this suit, the county employed approximately 175 full-time employees in thirty-five departments.
The citizens of Warren County first elected Supervisor. Shull to the board of supervisors in 2008. During his campaign, Shull promised to increase the overall efficiency of the county government. After Supervisors Yordi and Wilson joined the board in 2010, they elected Supervisor Shull to the position of board chair. Like Supervisor Shull, Supervisor Yordi campaigned on improving government efficiency when he ran for office.
In May 2013, the supervisors hired Mary Jean Furler for the newly created position of Warren County Administrator to assist them in achieving their objective of improving the efficiency of the county government. As county administrator, Furler implemented board actions, supervised appointed department heads, and directed preparation of the annual budget, among other duties. In addition, she was responsible for assisting the board with developing and prioritizing its policy objectives, goals, and strategic plans. Because Administrator Furler acted pursuant to delegated authority, the board’s power to act defined the scope of her own power to act on its behalf.
The events that led the employees to sue the board began in January 2014 when the annual county budget process was just getting underway. The Iowa Code requires elected or appointed officers and boards responsible for county offices and departments to submit itemized departmental budget estimates for the upcoming fiscal year to the county auditor or other designated official by January 15 of each year. Id. § 331.433. Department heads, county supervisors, and other officials meet to *225 discuss the estimated departmental budgets at a series of budget workshops. The county auditor or designated official then compiles the departmental' budgets into the overall county budget* which" the board of supervisors may adjust based on overall county objectives. The Code provides the board must approve the overall county budget at a public meeting and the chairperson of the board must certify the budget no later than March 15. Id. §§ 24.9, .1.7.
Warren County Budget Director Katherine Rupp was responsible for coordinating the county budget for fiscal year 2015. To that end, Director Rupp conducted.a series of budget workshops attended by the board, Administrator Furler, county department heads, and elected county officials in early January 2014. The county posted notice of the workshops in advance, and the workshops were open to the. public. During these workshops, neither Administrator .Furler. nor the supervisors mentioned the possibility of reorganizing the county government or asked-the department heads to reduce personnel costs. Likewise, when the supervisors discussed the budget at two additional open meetings "later in January, they did not mention the possibility of reorganizing the county government.
On March 4, the board of supervisors held a public meeting and unanimously approved the budget for the upcoming fiscal year. Director Rupp gave a presentation in which she reviewed the budget and summarized the main budget,issues facing the county. During that presentation, she noted personnel costs represented fifty-one percent of the proposed overall' county budget — a slight increase over.the prior year. Director Rupp attributed this change to rising health insurance costs, indicating that further cost increases resulting from the recent passage of federal healthcare legislation would need to be monitored and decisions made to minimize their effect. In addition, the county’s future revenue was" uncertain due to stagnant growth of the county’s property tax base and the possibility the state would stop supplementing county revenue to cover declines caused by recent commercial property tax reform: However, Director Rupp also noted Warren County Was the most populous county in the state without any debt and emphasized the proposed budget projected a significant decrease in expenditures compared to updated estimates for fiscal year 2014. The board unanimously approved the budget, which included all county employees’ present salaries and raises they were to receive during fiscal year 2015:
At the start of the budget process in January 2014, the board had not yet formalized a plan to eliminate any existing positions within the county workforce. Nevertheless, testimony at trial established that beginning in January, the supervisors and Administrator Furler worked together , to develop such a plan. By that point, Supervisor Shull had already had numerous discussions with Administrator Furler about reorganizing the county workforce. He testified the other supervisors also began meeting individually with Administrator Furler in January to discuss the reorganization, though no two supervisors were present at the same time when these disqussions occurred.
On February 4, the board passed a resolution at an.open meeting appointing Supervisor Wilson to review the county workforce “to determine if restructuring and/or reorganization [was] necessary to improve efficiencies and services provided to Warren County residents.” Supervisor Wilson was not present at the meeting because he was in Mexico. Nonetheless, Supervisors Shull and Yordi approved the resolution *226 appointing Supervisor Wilson to review the reorganization issue, as Supervisor Wilson had already agreed in advance to undertake the task by conveying his assent to the other supervisors through Administrator Furler. The resolution appointing Supervisor Wilson to review the possibility of reorganizing the county government passed without meaningful discussion. Supervisor Wilson remained in Mexico for the rest of the month, however, and he delegated his duties under the resolution to Administrator Furler.
While Supervisor Wilson was away, Administrator Furler began the task of performing research and all the legwork associated with the reorganization. From the start and throughout the entire process, she consulted with the board’s attorney, Michael Galloway. At trial, Administrator Furler claimed she performed her research regarding the reorganization mostly in March, but she admitted that she identified every employee who was eventually recommended for elimination in February. Evidence admitted at trial revealed that she also began working out the terms of the severance packages ultimately offered to the employees around the same time. Her handwritten notes show that she considered recommending each eliminated employee receive a severance package consisting of one week of pay for every three years of service and four months of health insurance. She also created a spreadsheet listing employees by their initials alongside their dates of hire, hourly rates, and health insurance costs to determine the cost of offering each eliminated employee a severance package consisting of one week of pay for every two years of service and six months of health insurance. Also during the month of February, Administrator Furler had lengthy discussions about the reorganization plans with her Mend Frank Bonnett, former Indianola police chief and labor consultant. Administrator Furler had also begun having detailed conversations about how best to accomplish the reorganization with Supervisor Shull, including a few conversations during which Bonnett was present.
Upon Supervisor Wilson’s return from Mexico in March, he met several times with Administrator Furler to discuss the work she had performed in his absence on the reorganization plan. Administrator Furler reduced her recommendations to writing with the help of Bonnett, whom she had formally retained to determine whether the county could realize cost savings while continuing to provide the same level of service to county residents. Administrator Furler and Bonnett prepared a written report together and revised it around one hundred times. That written report came to be known as the Bonnett report. In the process of writing and revising the Bonnett report, Administrator Furler placed separate calls to Supervisors Shull and Wilson to get their opinions with respect to various issues discussed therein. However, testimony at trial did not establish how many such calls she made or how close in time they occurred.
On separate occasions during the period following Supervisor Wilson’s return from Mexico, Administrator Furler discussed the reorganization plans and the Bonnett report with the individual supervisors. Administrator Furler and Bonnett met with Galloway, the board’s attorney, and Supervisors Shull and Wilson. Administrator Furler also met with Supervisor Yordi. During these discussions, Administrator Furler allowed the individual supervisors to voice their thoughts and concerns on various topics. She then reported those thoughts and concerns to the other supervisors.
By this process, the board reached a compromise on which positions to elimi *227 nate. Supervisor Shull did not want to eliminate the board, secretary position, and he voiced his concerns to Administrator Furler, who in turn shared them with Supervisors Yordi. and Wilson. Supervisors Yordi and Wilson, objected to retaining the board secretary position, however, because the board secretary and Supervisor Shull were friends and they did not want the public to perceive the board as playing favorites. When Administrator Furler reported their objections to Supervisor Shull, he agreed to compromise by eliminating the board secretary position.
Administrator Furler had similar conversations with the individual supervisors regarding other topics relevant to the reorganization, including the terms of the severance packages to be offered to employees in the positions being -eliminated. At the end of each meeting Administrator Furler had with an individual supervisor, she would find out whether that supervisor was going to approve whatever aspect of the reorganization plan they had discussed during that particular meeting. Administrator Furler and the supervisors held all these meetings in private and without posting advance .notice to the public.
At some point between March 13'and March 24, Administrator Furler distributed the final draft of the Bonnett report to the supervisors for review and confirmed with each supervisor that he -intended to approve the plan described therein. The final draft recommended eliminating the maintenance department, the payroll department, and the positions held by the board secretary, the zoning director, an assistant engineer, and an . engineering technician. It further-recommended con-' tracting out the maintenance, payroll, and' land-surveying functions • associated with the eliminated positions. With Galloway’s help, Administrator .Furler. drafted letters and severance agreements for the employ-. ees targeted for elimination. She showed samples of the proposed severance agreements to the individual supervisors and confirmed with each that he would approve the terms appearing therein. Again, Administrator Furler and the supervisors held these meetings outside of the public view..
On March 25 and 26, Administrator Fur-ler, Supervisor Wilson, and Galloway met with employees whose positions the Bon-nett report recommended for elimination. They gave each employee a letter stating the following on official board letterhead:
Warren County is implementing a restructuring of job responsibilities and duties in several departments effective March 26, 2014. Your position is being recommended for elimination. In lieu of a layoff, we are offering a severance package that must be approved by the Board of Supervisors.
The county is willing to provide a severance agreement to you of 1 week of pay for every 2 years of service plus six months health insurance coverage. In addition,, you will be placed on paid administrative leave for 21 days to review the resignation/severance agreement. It- is recommended you have a legal professional review the agreement.
The county thanks you for your service and believes the changes will create .a more efficient and streamlined county government.
Only Supervisor. Wilson’s name- and title appeared at the bottom of each letter.
In addition to a letter from Supervisor Wilson, each employee received a “Resignation of Employment and Release Agreement.” The agreements provided that, in return for resigning from employment and releasing any claims they might have against the county, the employees would receive severance pay under the terms described in the letters, continued insur- *228 anee coverage through October 31, and paid administrative leave until April 16. Administrator Furler and Galloway orally advised the employees the county was placing them on paid administrative leave for • twenty-one days and their positions had been recommended for elimination by the board. According to Administrator Furler, Galloway also conveyed to the employees his confidence, based on his conversations with the supervisors, that the supervisors would accept those recommendations. The employees were sent home with their personal belongings and were not permitted to finish their shifts.
Word of the reorganization quickly spread among the county’s other elected officials. "On March 26, the other elected officials met with Supervisor Shull and Administrator Furler to find out how the county would provide residents with necessary services going forward and why the board had not notified them of any potential problems with the county budget. The elected officials suggested that perhaps they could have helped the supervisors avoid the layoffs had the board advised them of -the situátion. Administrator Fur-ler responded by explaining that the supervisors could not talk to anybody about the reorganization and needed everything to be kept quiet. Supervisor Shull portrayed the layoffs as something the county had to do. Despite the officials’ concerns about continuity of services for county residents, within days outside vendors were handling the payroll and maintenance duties previously performed by employees in the eliminated positions.
On April 16, six employees filed suit against the board, the county, and the individual supervisors, claiming the board’s actions violated the open meetings law and seeking injuhetive and other remedies. Two days after the employees filed suit, the board held an open meeting on April 18. The agenda appearing on the “special meeting notice” the board posted prior to the meeting listed two items: (1) “Consider Recommendation of Re-organization and Approval of Reduction-in-Force” and (2) “Consideration and Action on Severance Agreements.”
The open meeting on April 18 lasted approximately twenty minutes. Minutes before ' it began, Administrator Furler placed copies of the Bonnett report, which had not previously been released to the public, on a table at the back of the room. She also gave a copy to each supervisor and the county auditor. Once the meeting began, Administrator Furler spoke briefly from notes she prepared in advance about the severance packages offered to the employees in the eliminated positions, noting that'five employees had opted to sign resignation agreements and six employees had not. Galloway then made a short presentation contending the board had complied with the open meetings law.
Without discussion, the supervisors unanimously passed two resolutions at the open' meeting. The first resolution- approved the recommendations contained in the Bonnett report. The second resolution approved the severance, agreements signed by, five of the employees whose positions the county had eliminated. The board did not allow any public comments.
On May 5, the county issued ’ COBRA notices to the employees who elected not to,, sign: the resignation agreements. The notices listed “termination” as the employees’ COBRA-qualifying event and listed the date that event had occurred as April 16, even though the board did not-actually vote to approve-the terminations at an open meeting until -April 18.,
The'district court tried the casé in July. The judge declined to award relief to the terminated employees, finding the employees-failed to prove by a preponderance of *229 the evidence that a majority of the board deliberated about the reorganization in violation of the open meetings law.
The district court first addressed the employees’ allegations that a majority of the supervisors deliberated the reorganization during closed-door, in-person- gatherings witnessed' by the board secretary. Former board secretary Shélly Vander Tuig testified at trial that several closed-door meetings took place between a majority of the supervisors ■ and Administrator Furler in January arid February 2014. The court pointed out that on cross-examination, Vander’ Tuig admitted she was not present at those gatherings and was never told what was discussed during them. In addition, Administrator Furler and the supervisors- all denied a majority of the supervisors had ever met to discuss county business, and understood their doing so would have constituted a violation of the open meetings law. The court consequently found the employees failed to prove by a preponderance of the evidence that a majority of the board deliberated about the reorganization in person during those closed-door gatherings.
The - district court next addressed the question of whether the supervisors violated the open meetings law by using Administrator Furler as a conduit to deliberate the details of the reorganization. The court concluded the evidence established the supervisors deliberated the,reorganization through Administrator Furler, rejecting the notion that the board distributed the severance agreements before the. supervisors engaged in discussions and evaluative processes in arriving at a decision or policy. ,
■ The district court then turned to the question of whether the evidence- established a gathering of- a majority of the board' triggered the requirements of openness and public notice under the open meetings law. Interpreting Iowa Code section 21.2(2), the district court found the supervisors did not violate the open meetings law by using a third party to deliberate the reorganization because a majority of the supervisors did not gather as required by the definition of'meeting in the Code.
The employees appeal.
II. Issues.
Neither party appealed the district court finding that' the evidence established the supervisors' deliberated the details of the reorganization through Administrator Fur-ler. Therefore, we do not address that issue in this opinion. Rather, we address the following issues in this appeal. First, whether substantial evidence supports the district court finding that a majority of the supervisors never deliberated the reorganization during the closed-door, in-person gatherings observed by the board secretary. Second, whether the district court correctly interpreted section 21.2(2) when it concluded the gatherings attended by the individual supervisors and the county administrator did not constitute gatherings of a majority of the -members of the-board.
III. Scope of Review.
Actions to enforce the open meetings'law are ordinary, not equitable, actions. Schumacher v. Lisbon Sch. Bd., 582 N.W.2d 183, 185 (Iowa 1998). In such actions, we accord a trial court’s factual findings the same degree of deference we accord a jury’s special- verdict. See Iowa R.App. P. 6.907. Thus, factual findings by the trial court are binding if substantial evidence supports them. See Schumacher, 582 N.W.2d at 185; Tel. Herald, Inc. v. City of Dubuque, 297 N.W.2d 529, 533 (Iowa 1980). Substantial evidence supports a factual finding when the finding “may be reasonably inferred from the evi *230 dence presented.” Vaughan v. Must, Inc., 542 N.W.2d 588, 538 (Iowa 1996).
Additionally, this appeal requires us to construe the Iowa open meetings law. See Iowa Code §§ 21.2(2), .3. We review questions of statutory construction for correction of errors at law. Estate of Ryan v. Heritage Trails Assocs., Inc., 745 N.W.2d 724, 728 (Iowa 2008).
IV. Whether Substantial Evidence Supports the District Court Finding that a Majority of the Supervisors Never Deliberated the Reorganization During Closed-Door, In-Person Gatherings Witnessed by the Former Board Secretary.
The district court implicitly found that any closed-door, in-person gatherings of a majority of the supervisors the board secretary witnessed were not meetings because they did not involve deliberation or action upon matters within the scope of the board’s policy-making authority. See Iowa Code § 21.2(2). When reviewing a claim that substantial evidence does not support a district court finding, we are required to view the evidence in the light most favorable to the judgment and liberally construe the court’s findings to uphold, rather than defeat, the result reached. State v. Dohlman, 725 N.W.2d 428, 430 (Iowa 2006). Evidence supporting a district court finding is not insubstantial merely because we may draw a different conclusion from it. Iowa Beta Chapter of Phi Delta Theta Fraternity v. State, 763 N.W.2d 250, 257 (Iowa 2009). The crucial question in determining whether substantial evidence supports a district court finding is not whether the evidence would support a different finding, but whether the evidence supports the finding actually made. Id.
At trial, former board secretary Vander Tuig testified she observed a majority of the board attend closed-door, in-person gatherings on numerous occasions in the board offices in January and February 2014. Hers was the only eyewitness testimony offered in support of the employees’ claim that the supervisors deliberated the reorganization during closed-door, in-person gatherings at which a majority of the supervisors were physically present. But as the district court observed, Vander Tuig admitted she had no first- or secondhand knowledge regarding the subject matter of the discussions taking place during any closed-door, in-person gatherings. She admitted she never heard what the supervisors discussed, nor did anyone tell her what the supervisors discussed after the fact.
The supervisors and the county administrator — the individuals alleged to have been present during the improper closed-door deliberations — testified they understood the open meetings law and had developed an elaborate methodology of communicating with each other through Administrator Furler in order to avoid triggering the open meetings requirements. Furthermore, they all denied any discussion of board business occurred in any closed meeting attended by a majority of the supervisors.
The district court weighed the testimony of the former board secretary against the testimony of the supervisors and the county administrator, credited the latter, and found the supervisors never deliberated the reorganization during any closed-door, in-person meetings the board secretary witnessed. As the finder of fact, weighing the proffered testimony and determining its credibility was the district court’s duty. Second Injury Fund v. Braden, 459 N.W.2d 467, 471 (Iowa 1990). Although the district court might have made a dif *231 ferent determination, substantial evidence supports the determination it made. Therefore, we affirm the district court finding that a majority of the supervisors never deliberated the reorganization during any closed-door, in-person gathering witnessed by the former board secretary.
V. Whether the District Court Correctly Concluded the Serial Gatherings Attended by the Individual Supervisors and the Coünty Administrator Did Not Constitute a “Gathering ... of a Majority of the Members” of the Board Under Iowa Code Section 21.2(2).
This case requires us to interpret the definition of “meeting” contained in section 21.2(2) of the Code. It provides,
“Meeting ” means a gathering in person or by electronic means, formal or informal, of a majority of the members of a governmental body where, there is deliberation .or action upon any matter within the scope of the governmental body’s policy-making duties. Meetings shall not include a gathering of members of a governmental body for purely ministerial or social purposes when there is no discussion of policy or no intent to avoid the purposes of this chapter.
Iowa Code § 21.2(2).
The district court found the board of supervisors deliberated various details of the reorganization of the county government through Administrator Furler. Neither party appealed this finding. It is also uncontested that the reorganization of county government is a matter within the scope of the board’s policy-making duties. Thus, these aspects of the definition in section 21.2(2) are not at issue in this appeal. Instead, at issue is the meaning of the phrase “a gathering in person or by electronic means, formal or informal, of a majority of the members of a governmental body.” Id.
The supervisors argue a gathering within the meaning of section' 21.2(2) occurs only when a majority of the members of a governmental body personally assemble in close temporal proximity. In contrast, the employees contend that in order to reach a solid consensus on the reorganization plan the supervisors necessarily had to gather in order to deliberate as a body. The amici curiae contend Administrator Fur-ler acted as each supervisor’s agent by conveying his thoughts and opinions to the other supervisors. Thus, they contend each gathering between Administrator Furler and an individual supervisor was the legal equivalent of a gathering between two or three supervisors.
When interpreting a statute, our goal is to determine legislative intent. Auen v. Alcoholic Beverages Div., 679 N.W.2d 586, 590 (Iowa 2004). Before resorting to. rules of statutory construction, we determine whether the language chosen by the legislature is ambiguous. Zimmer v. Vander Waal, 780 N.W.2d 730, 733 (Iowa 2010). A statute is ambiguous if reasonable persons can disagree on its meaning. State v. Wiederien, 709 N.W.2d 538, 541 (Iowa 2006). Ambiguity - may arise regarding the meaning of particular words or the general scope and meaning of a statute. Holiday Inns Franchising, Inc. v. Branstad, 537 N.W.2d 724, 728 (Iowa 1995). In addition, “when a literal interpretation of a statute results in absurd consequences that undermine the clear purpose of the statute, an ambiguity arises.” Sherwin-Williams Co. v. Iowa Dep’t of Revenue, 789 N.W.2d 417, 427 n. 8 (Iowa 2010), We interpret statutes to reflect common law principles existing at the time of their enactment unless the language the legislature chose specifically ne *232 gates the common law. State v. Dullard, 668 N.W.2d 686, 595 (Iowa 2003).
Regarding the purpose of the open meetings law contained in chapter 21 of the Iowa Code, the legislature has indicated,
This chapter seeks to assure, through a requirement of open meetings of governmental bodies, that the basis and rationale of governmental decisions, as well as those decisions themselves, are easily accessible to the people. Ambiguity in the construction or application of this chapter should be resolved in favor of openness.
Iowa Code § 21.1. Our caselaw affirms this legislative intent. See, e.g., Tel. Herald, 297 N.W.2d at 532.
In Telegraph Herald, we recognized the “legislature’s apparent intent that temporal proximity exist among members of the governmental body” in order for a “meeting” subject to the open meetings requirements- to take place. Id. at 534; However, the question, we faced in that case is distinguishable from the question- we face in this ease. In the former, we considered whether an open meetings violation occurred when members of a city council interviewed applicants for the position of city manager during a series of gatherings at which less than a majority of the council members were present at various times and places. Id. at 531-34. The specific theory we considered was whether serial submajority gatherings could constitute an informal meeting to which,the open meetings law applies. Id. a,t 532-34.
We concluded the serial sub-majority gatherings did not violate the open meetings láw because they did not constitute gatherings to which open meetings requirements applied for two reasons. First, the council members obviously did not deliberate regarding whom they would actually hire during the interviews.[1] Id. at 532-33. Second, in interpreting- section 21;2(2), we concluded that in order for serial submajority gatherings to collectively constitute a meeting of the majority of a governmental body and trigger the open meetings requirements, a majority of the members must deliberate in temporal proximity to each other. Id. at 533-34. Because there was no demonstration of temporal proximity among the gatherings at which the interviews took place, we concluded they did not trigger the open meetings requirements. See id.
Our resolution to the question we faced in Telegraph Herald does not answer the question we face in this case. First, in this case, there is no question that the board members collectively deliberated during the meetings between the individual board members and the county administrator. As previously noted, thé district court found that they did, and the parties do not dispute that finding. Second, the employees do not claim the open meetings requirements were triggered by serial sub-majority gatherings or assert that serial meetings attended by the individual board members collectively constituted a meeting within the meaning of the statute.
*233 Rather, the employees- claim the open meetings requirements were triggered when a majority of the board intentionally deliberated the reorganization using the county administrator as their conduit because doing so was legally equivalent to deliberating the reorganization during a gathering'at which a majority of the board was personally present. In other words, they contend each meeting between an individual board member and the county administrator during which the administrator deliberated the reorganization plan at the behest of another board member legally constituted an informal in-person gathering of a majority of the board involving deliberation concerning matters within the scope of the board’s policy-making duties.[2] See Iowa Code § 21.2(2). If the employees’ interpretation of section 21.2(2) is correct, each gathering attendéd by a board member and the county administrator during which the administrator deliberated the reorganization while acting on behalf of another board member legally constituted a meeting to which the open meetings law applied. The first board member was physically present in person, and the second board member was physically present by virtue of the county administrator acting as his agent. We have yet to address this scenario under our open meetings law.
Were we to assume the legislature was unfamiliar with agency principles when it enacted the open meetings law, we might construe the term' “gathering” narrowly to conclude the open meetings requirements apply only to face-to-face deliberations during which a majority of the members of a governmental body are personally physically present and to electronic or serial submajority deliberations among a majority of members occurring in close temporal ‘proximity. However, ■ such a narrow construction of the term would clearly be at odds with the intended scope and purpose of our open meetings law “to assure, through a requirement of open meetings of,governmental bodies, that the basis and rationale of- governmental decisions-, as well' as those decisions themselves, are easily accessible to the people.” See id. § 21.1, Adopting the interpretation of section 21.2(2) urged by the board and its members would result, in absurd consequences undermining the clear purpose of the open meetings law. We therefore conclude the statute is ambiguous with respect to the question of whether governmental bodies may utilize agents to deliberate on their behalf without triggering the open meetings requirements. See Sherwin-Williams, 789 N.W.2d at 427.[3]
*234 We believe resolving this ambiguity requires us to consider whether the common law of agency influences the proper interpretation of section 21,2(2). The legislature clearly instructed that ambiguities arising in construing the open meetings law should be resolved in favor of openness. Iowa Code § 21.1. We also recognize that well-settled common law principles predating the enactment of a statute may be instructive in clarifying the ambiguities arising when we interpret it. See State v. McIver, 858 N.W.2d 699, 704 (Iowa 2015) (citing 2A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 45:2, at 16-17 (7th ed. rev. 2014)); see also Dullard 668 N.W.2d at 595. The legislature generally anticipates that courts will turn to the common law to resolve statutory ambiguities in statutory text. In fact, the legislature has instructed us to do precisely that. See Iowa Code § 4.6(4). Accordingly, because the concept of agency predates the enactment of the open meetings law and accounting for that concept in construing the open meetings law is consistent with the object the legislature sought to attain by its enactment, we conclude agency principles are relevant in the context of applying section 21.2(2).
We have long recognized the general principle that members of a public board “may authorize performance of ministerial or administrative functions” but cannot delegate “matters of judgment and discretion.” Bunger v. Iowa High Sch. Athletic Ass’n, 197 N.W.2d 555, 559-60 (Iowa 1972). The open meetings statute reflects the reality that deliberation upon matters of public policy involves judgment and discretion. See Iowa Code § 21.2(2). Thus, our conclusion that public bodies cannot use agents to deliberate matters of public policy without triggering the open meetings law is consistent with this principle. In contrast, were we to reach the opposite conclusion, we would encourage members of governmental bodies to enlist agents to deliberate matters of public policy on their behalf outside the public view in order to purposefully evade the open meetings law.
Because we conclude agency principles are relevant to determining whether a gathering satisfies the statutory definition of meeting in section 21.2(2), we conclude the legal equivalent of an in-person gathering of a majority of the members of a public body takes place whenever a majority of the members of a governmental body meet, whether each member attends personally or through an agent. See, e.g., Andrews v. Young Men’s Christian Ass’n of Des Moines, 226 Iowa 374, 380, 284 N.W. 186, 190 (1939) (“He who acts through another acts by and for himself.”). Indeed, the concept of agency is so fundamental to the common law that some courts have assumed a gathering personally attended by fewer public officials than is required to satisfy a statutory definition of “meeting” may nonetheless constitute a meeting whenever a sufficient number of public officials attend the gathering by virtue of their agents. Claxton Enter, v. Evans Cty. Bd. of Comm’rs, 249 Ga.App. 870, 549 S.E.2d 830, 834-35 (2001) (stating that “a meeting is required to be open only when a -quorum of a governing body or its agents have gathered” though the statute defined “meeting” as “the gathering of a quorum of the members of the governing body of an agency or of any committee ... *235 at a designated time and place ... at which official action is to be taken” (quoting Ga.Code Ann. § 50-14-1(a)(2) (1999))); State ex rel. Newspapers, Inc. v. Showers, 135 Wis.2d 77, 398 N.W.2d 154, 164-35 (1987) (“Common sense also tells us ... that if proxies .are present so as to realistically make-up a majority, the Open Meeting Law applies.”). ;
Generally, an agency relationship exists when ah agent has actual or apparent authority to act on behalf of a principal and both principal and agent have mutually manifested assent to create it.[4] See Soults Farms, Inc. v. Schafer, 797 N.W,2d 92, 100 (Iowa 2011); G & J Vantage Leasing Co. v. Wolfe, 795 N.W.2d 65, 79 (Iowa 2011). Actual authority exists when a principal has expressly or by implication granted an agent authority to act on his or her behalf. Soults, Farms, 797 N.W.2d at 102. A party may prove a principal granted an agent actual authority to act on his or her behalf by circumstantial evidence. Id. Manifestations of assént include written or spoken words or other conduct and may be inferred from surrounding facts and circumstances. Id. at 101. For example, an agent may manifest assent merely by performing actions he or she has been empowered by the principal to perform or carrying out actions that objectively benefit the principal. Id. “The party asserting an. agency relationship must prove its existence by a preponderance of the evidence.” Id. at 100.
Here, the record amply supports the district court finding that the supervisors intentionally developed a “sophisticated methodology of communicating effectively with one another” about county business outside the public view “by using Administrator Furler as a conduit.” As the district court found, the record shows Administrator Furler and the supervisors understood that it would trigger the open meetings requirements if two or more supervisors met in person to discuss the reorganization or other county business. Thus, the record clearly supports thé district court’s conclusion that the supervisors deliberately used Administrator Furler to flesh out the details of the reorganization plan and resolve conflicts among themselves about how best to accomplish the reorganization outside the. public view.
The record also supports. the district court finding that the supervisors used Administrator Furler to deliberate the reorganization plan in that manner because they knew the plan would be controversial and anticipated conflict and discomfort would result if they discussed it in a public forum. As the testimony recounted at length by the district court clearly demonstrates, the supervisors actively avoided discussing the reorganization in public meetings by having Administrator, Furler meet with them individually to gather and convey information they intentionally shared with her in order to allow her to facilitate their communication with each other. By this method, the supervisors compromised regarding key details of the reorganization plan, including which positions to eliminate and the terms of the severance packages to be offered to eliminated employees.
Substantial evidence supports the findings by the district court. See Vaughan, 542 N.W.2d at 538. Using Administrator Furler to conduct shuttle diplomacy and deliberate county business worked so well *236 for the supervisors, they managed to implement the restructuring of the county government without deliberating a single detail of the reorganization plan during a public meeting. ’ i
Although we agree with the district court’s assessment of the facts, the court made a legal error in interpreting section 21.2(2). Consequently, it did not apply agency principles in determining whether the actions of the supervisors and the county administrator violated the open meetings law. The employees Urge us to conclude the district'court implicitly found the administrator acted as an agent of one or more supervisors in conducting shuttle diplomacy among them on their behalf. After all, if the administrator never acted as an agent of one or more of the supervisors during any of her conversations with the other supervisors, how could the supervisors have deliberated every detail of the reorganization plan and implemented it prior to the public meeting?
We would be well within our power to find an agency relationship existed on a de novo review. However, in this appeal we review the district court’s ruling for correction of errors at law. Because the district court erroneously interpreted section 21.2(2) and did" not make the factual findings necessary to determine whether the gatherings attended by the individual supervisors and the county administrator constituted meetings subject to the open meetings requirements under a proper interpretation of the statute, we must remand the case to the district court.
On remand, the district court should determine the nature and extent of the actual authority the supervisors granted Administrator Furler when they intentionally used her to deliberate the reorganization plan outside the public view in an attempt to avoid triggering the open meetings requirements. See Mayrath Co. v. Helgeson, 258 Iowa 543, 547, 139 N.W.2d 303, 305-06 (1966) (acknowledging that “usually the nature and extent of the authority of an agent, and whether his acts ... are within the scope of his authority, are questions of fact”). If the court finds an agency relationship existed and Administrator Furler acted within the scope of her authority in helping the supervisors to deliberate the details of reorganization, it should apply section 21.2(2) in accordance with this opinion to conclude that a violation of the open meetings law occurred.
The board argues we should not interpret section 21.2(2) in this manner because treating public employees as the agents of public officials would in effect prohibit communication between employees and elected officials outside public meetings. We disagree. The open meetings law permits members of á governmental body to discuss with its employees matters concerning its operation.
In Telegraph Herald, we rejected the contention that a prohibited closed meeting occurs any time a member of a governmental body discusses government business with another individual. 297 N.W.2d at 534. In doing so, we concluded,
The composite rationale which may be distilled from [judicial decisions addressing open meetings laws] is that such laws do not prohibit gatherings of less than a majority of the governing body where decisions are not made and official actions are not taken and that the right of free speech might be violated by a law forbidding any discussion by public officers between meetings. Activities of a governmental body’s individual members to secure information to be reported and actéd upon at an open meeting ordinarily do not violate sunshine statutes. Any other rule would hamstring the progress of governmental *237 bodies, and impose intolerable time burdens on unpaid officeholders.
Id, at 533-34 (footnote omitted).;
If the individual board members and the county administrator had.gathered merely for the purpose of gathering, information or discussing the various options available to the board in implementing the reorganization or achieving government efficiency, a meeting under section 21.2(2) would not have occurred. However, the district court found much more than general discussion or information exchange took place. The district court expressly found the supervisors ' intentionally used the county administrator to deliberate concerning matters of public policy by having her engage in “discussion and evaluative processes in arriving at a decision.” See Hettinga v. Dallas Cty. Bd. of Adjustment, 375 N.W.2d 293, 295 (Iowa Ct.App.1985) (quoting 1997 Op. Iowa Att’y Gen. 164, 166, 1979 WL 21166, at *3).
In fact, the supervisors concede they intentionally used the' county administrator to facilitate discussion amongst themselves concerning various aspects of the reorganization and to negotiate an agreement concerning the precise details of the reorganization plan, as evidenced by the fact that the board never discussed the plan at an open meeting before they actually implemented it; The legislature clearly intended public bodies subject to the open meetings law to deliberate the basis and rationale for important decisions such as these, as well as the decisions themselves, during open meetings. Iowa Code § 21.1.
Thus, we conclude district courts must apply agency principles in determining whether an in-person gathering satisfies the statutory definition of meeting in section 21.2(2). Accordingly, the open meetings requirements apply to all in-person gatherings at which there is- deliberation upon 'any matter within the scope of the policy-making duties of a governmental body by a majority of its members, including- in-pérson gatherings' attended by members of a governmental body through agents or proxies.'
VI. Conclusion and Disposition.
In. summary,- the open meetings law does not prohibit discussions between members of a governmental body and its staff to exchange ideas and gather information in order for the body to act upon an issue during an'open meeting. However, the open meetings law does prohibit the majority of a governmental body gathering in person through the use of agents or proxies to deliberate any matter within the scope of its policy-making duties outside the public view. The open meetings law is intended to safeguard free and open democracy by ensuring the government does not unnecessarily conduct its business in secret.
Because the district court incorrectly interpreted section 21.2(2) in applying the open meetings law, we reverse its judgment and remand the case. On remand, the district court should make the necessary factual findings and apply the proper interpretation of the statute in a manner consistent with this opinion.
■ If the district court finds the supervisors acted through an agent when they deliberated the reorganization, the district court should grant the employees appropriate relief. We are aware Iowa Code section 21.6(3)(c) allows the district court to void any action taken by the board if “the court finds under the facts of the particular case that the public interest in the enforcement of the policy of [chapter 21] outweighs the public interest in sustaining the'validity of the action taken in the closed session.” However, in considering what relief is appropriate under the circumstances of this *238 case, the court should note that the. board eventually approved the reorganization plan at an open .meeting and should ¿consider whether this subsequent approval complied with the open meetings requirements and cured any violation of the open meetings law. See Valley Realty & Dev., Inc. v. Town of Hartford, 165 Vt. 463, 685 A.2d 292, 296 (1996) (holding a land purchase made in violation of an open meetings law should not be voided because its ratification in a subsequent meeting complying with open meetings requirements eured the violation of the open meetings law).
REVERSED AND REMANDED WITH DIRECTIONS.
CADY, C.J., HECHT and APPEL, JJ„ join this opinion. WATERMAN, J., files a dissenting opinion in which MANSFIELD and ZAGER, JJ„ join. MANSFIELD, J., files a separate dissenting opinion in which WATERMAN and ZAGER, JJ., join.

. Deliberation generally involves "discussion and evaluative processes in arriving at a decision or policy," Hettinga v. Dallas Cty, Bd. of Adjustment, 375 N.W.2d 293, 295 (Iowa Ct.App.1985) (quoting 1979 Op. Iowa Att’y Gen. 164, 166, 1979 WL 21166, at *3). Although a gathering may be "purely ministerial” if members of a body assemble simply to receive information without discussing policy or intending to avoid the purposes of the open meetings law, ministerial activities may develop into deliberation if the members of a governmental body "engage in any discussion tiiat focuses at.all concretely on matters over which they exercise judgment or discretion." Id. (quoting Op. Iowa Att’y Gen. No. 81-7-4(L) (July 6, 1981), 1981 WL 178383, at *6).

. The Warren County Board of Supervisors is a three-person board. Thus, a majority of the board deliberates whenever two members of the board engage in "discussion and evaluative processes in arriving at a decision or policy.” Hettinga, 375 N.W.2d at 295 (quoting 1979 Op. Iowa Att’y Gen, at 166, 1979 WL 21166, at *3).

. The district court and the board note our legislature twice considered, but failed to pass, proposed bills that would have amended section 21.2(2) to address serial submajority gatherings. Specifically, the legislature failed to pass two bills that each proposed amend- ' ■ ing section 21.2(2) to add the following sentence:
A meeting includes a series of gatherings of members who constitute less than a majority of the members at each gathering, but who collectively constitute a majority of the members, where the series of gatherings includes deliberation or action upon any matter within the scope, of the governmental body’s policy-making duties.
See S.F. 282, 83rd G.A,,. 1st Sess, § 6 (Iowa 2009); H.F. 372, 81st G.A., 1st Sess. § 1 (Iowa 2005). Relying on the legislature’s failure to amend section 21,2(2), the board accuses the employees of asking this court to legislate from the bench and change the definition of meeting in a way the legislature was unwilling to do. Essentially, the board seeks to rely on the presumption that legislative *234 silence signals acquiescence in an existing interpretation of a statute. See Gen. Mortg. Corp. v. Campbell, 258 Iowa 143, 152, 138 N.W.2d 416, 421 (1965). However, the legislature's failure to pass proposed bills addressing serial submajority gatherings is irrelevant to the question of whether a member of a governmental body may use an agent to deliberate on his or her behalf in order to avoid triggering the open meetings requirements.

. We have never considered whether agency may exist by virtue of apparent authority in the municipal government context, but we need not address that issue in this case. See Dillon v. City of Davenport, 366 N.W.2d 918, 923 (Iowa 1985) (declining to reach the apparent authority issue).