# In the Iowa Supreme Court

No. 24–1309

Submitted March 24, 2026—Filed April 17, 2026

**Paul R. Gausman,**

Appellee,

vs.

**Sioux City Community School District, Daniel D. Greenwell, Jan George, Taylor Goodvin,** and **Bob Michaelson,**

Appellants.

Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, judge.

A school board appeals and a former superintendent cross appeals from a district court order involving the legality of two school board meetings under the Iowa Open Meetings Act. **Appeal Reversed; Cross-Appeal Affirmed.**

McDonald, J., delivered the opinion of the court, in which all justices joined.

Jason M. Craig (argued) and Brett S. Nitzschke of Ahlers & Cooney, P.C., Des Moines, for appellants.

Stanley E. Munger (argued) of Munger, Reinschmidt & Denne, LLP, Sioux City, for appellee.

**McDonald, Justice.**

Under Iowa's Open Meetings Act, all "[m]eetings of governmental bodies . . . shall be held in open session unless closed sessions are expressly permitted by law." Iowa Code § 21.3 (2022). The Act lists twelve exceptions under which a governmental body may hold a closed session. *Id.* § 21.5(1)(*a*)–(*l*). When a governmental body properly invokes an exception, the "governmental body shall not discuss any business during [the] closed session which does not directly relate to the specific reason announced as justification for the closed session." *Id.* § 21.5(2). The school board of the Sioux City Community School District held two closed sessions in 2022 that are at issue in this appeal. The justification for the first was to "evaluate the professional competency of an individual whose . . . performance . . . [was] being considered" *Id.* § 21.5(1)(*i*). The justification for the second was to "review or discuss records which are required or authorized by state or federal law to be kept confidential." *Id.* § 21.5(1)(*a*). We must decide in this appeal whether the discussion during the first meeting exceeded the scope of the announced justification and whether the records discussed during the second meeting were "confidential."

I.

Paul Gausman served as the superintendent of the Sioux City Community School District from July 1, 2008, until June 30, 2022. In November of 2021, Gausman attended a meeting of the Iowa Association of School Boards in Des Moines. Then school board member Perla Alarcon-Flory and incoming board members Jan George and Bob Michaelson also attended the event. Following the formal programming, the four individuals decided to socialize at the hotel bar. As the evening progressed, Gausman urged George to vote Alarcon-Flory for board president. George described it as a "quid pro quo" conversation. Gausman

had a similar conversation with Michaelson regarding board leadership. It made Michaelson uncomfortable. George and Michaelson recall Gausman offering his support for the board's priorities in exchange for their Alarcon-Flory vote, but Gausman testified that he did not offer anything in exchange for votes and simply expressed his opinion regarding who would provide the best board leadership.

In the months that followed, George and Michaelson approached board president Daniel Greenwell and asked to discuss the Des Moines conversations as a full board. Greenwell responded that they could discuss those concerns at Gausman's upcoming regularly scheduled performance evaluation.

Gausman's quarterly performance evaluation was scheduled for January 24, 2022. Gausman requested the evaluation be conducted in closed session, as he had done in the past and as was consistent with the board's past practice. The week before the evaluation was to take place, Seamus Heilman, Gausman's assistant and the board secretary, prepared the meeting agenda and sent a calendar invitation for the closed session to the board members "on behalf of Gausman."

The board had an established policy for evaluating employees, as required by Iowa Code section 279.23A. Board policy 301 identified the ten minimum criteria by which the board was to evaluate Gausman's performance in his role as the superintendent. Those criteria included: mission, vision, and core values; ethics and professional norms; equity and cultural responsiveness; curriculum, instruction, and assessment; community care and support for students; professional capacity of school personnel; professional community for teachers and staff; meaningful engagement of families and community; operations and management; and school improvement. The policy made clear that these were the minimum criteria, and it expressly provided that the formal evaluation

framework "supports and does not preclude the ongoing, informal evaluation of the Superintendent's skills, abilities and competence."

On the day of the January meeting, the board entered closed session pursuant to Iowa Code section 21.5(1)(*i*) to evaluate Gausman's competency and performance. Before beginning the interactive portion of the evaluation with Gausman present, the board spent approximately the first half hour in a board-only discussion. The evaluation started with a discussion of ethical issues. Michaelson stated that what occurred in Des Moines "cause[d] [him] angst" and that he did not "know what to do with it." George agreed that it was "quid pro quo type of behavior" and that it "caught [him] off guard." Another board member, who was not present for the conversation in Des Moines, Monique Scarlett, sought to clarify whether Gausman's conduct rose to a level of concern. She had "heard there was a lot of alcohol consumed that night[,] . . . so [the] conversation was pretty loose." Greenwell was more pointed in his assessment: "[t]o me it was a bribery attempt." He expressed that this was not an isolated incident of unethical behavior but a pattern that he found concerning. It was a "trust issue." He suggested that the board seek legal guidance and raised the possibility of involving the Iowa Board of Educational Examiners (IBOEE). Alarcon-Flory "didn't see it the way it's being represented." Rather, she "underst[oo]d there to be a lack in judgment," unwise but not necessarily illegal. Another board member thought it needed to be resolved one way or another: "If it's a letter in his file, I mean at least we did what we were supposed to do. If it's nothing[,] so be it." Ultimately, all board members agreed that seeking legal advice was the best next step. After a brief discussion about how the board would conduct the remainder of the evaluation, Gausman was admitted back into the room to complete the evaluation. Although Gausman was present, the session

remained closed to the public, consistent with Gausman's request and past practice.

Greenwell and Taylor Goodvin (then vice president of the board) met with outside counsel the following day. A few days after the January 24 meeting, Greenwell and Goodvin met with Gausman to discuss what had occurred in the first part of the closed session outside Gausman's presence. They informed Gausman that ethical concerns were raised and that outside counsel would likely be retained. Greenwell said Gausman responded that he had done a "very dumb thing." Gausman asked for "grace" and expressed his willingness to cooperate with any investigation.

The board consulted legal counsel but declined to file a complaint with the IBOEE at that time. Greenwell thought waiting to file the complaint was the more prudent course. He knew that Gausman was a finalist for a different superintendent position and would likely be leaving the district soon. As expected, Gausman left the district in June to become the superintendent of the Lincoln, Nebraska school district.

Once Gausman was no longer employed by the district, on August 1, 2022, Greenwell submitted an ethics complaint against Gausman to the IBOEE. That complaint was dismissed for lack of jurisdiction because Greenwell did not obtain board approval prior to filing. On November 30, 2022, the board held a special meeting to discuss filing a complaint against Gausman. The board entered into closed session pursuant to Iowa Code section 21.5(1)(*a*) to discuss the complaint. The discussion centered on two incidents of alleged misconduct: first, the Des Moines conversations and, second, a later allegation that Gausman improperly disclosed to his cabinet confidential closed-session information from a March 2022 meeting. Greenwell sought the board's authorization to file an

IBOEE complaint based on these two incidents. The board returned to open session, and it publicly approved filing a complaint as discussed in the closed session.

After the complaint was filed, Gausman brought this suit against the district and four board members: Greenwell, George, Goodvin, and Michaelson. Gausman alleged that the closed sessions held on January 24 and November 30 violated the Open Meetings Act. Trial was held in two phases. The first phase involved only whether the meetings were held in violation of chapter 21. The district court found that the first part of the January 24 session was closed in violation of the statute. The court found it was "clear . . . that the discussion at the beginning of the January 24, 2022 closed session was not directly related to the evaluation the school board had initiated with Gausman" but instead "related to a potential investigation and the anticipated filing of a complaint with the IBOEE by the school board." The district court held that there was no violation with regard to the November 30 meeting because the board closed the meeting to discuss records created for the purpose of filing a complaint with the IBOEE. The complaint materials were confidential records within the scope of section 21.5(1)(*a*), and the confidentiality of the records justified the closed session.

Having found one violation, the district court proceeded to phase two regarding remedies and enforcement. Each individually named board member invoked the statutory safe harbor defense, testifying they acted in good faith and in reliance on an advisory opinion from the Iowa Public Information Board. *See* Iowa Code § 21.6(3)(*a*)(2)–(3). The district court credited those defenses for George, Goodvin, and Michaelson, finding it "abundantly clear" they believed the board-only discussion was an ethical matter within the scope of the evaluation.

With respect to Greenwell, the court found that he did not act in good faith and was not entitled to the statutory safe harbor protection. The district court found that Greenwell's description of Gausman's conduct as "bribery" evidenced "a more sinister perspective," i.e., bad faith.

On that basis, the district court held that Greenwell was liable for statutory damages in the amount of $500 plus attorney fees and costs. The court then held a separate fee proceeding and entered a final fee order. The court recognized that our caselaw requires proration of fees related to the success of each claim, but it rejected the board's proposal to simply cut the fees in half, reasoning that such a blunt division would be "arbitrary and unfair" given overlap in work across the two claims. It reduced Gausman's fee request by $5,928.12, leaving a total of $52,704.86 payable by Greenwell. The school district appealed.

## II.

We review a district court's interpretation of the Open Meetings Act for the correction of errors at law. *Hutchison v. Shull*, 878 N.W.2d 221, 229–30 (Iowa 2016). Once the plaintiff establishes that the governmental body is subject to chapter 21 and held a closed session, the burden shifts to the district to prove that the meeting was closed in compliance with the Act. *KCOB/KLVN, Inc. v. Jasper Cnty. Bd. of Supervisors*, 473 N.W.2d 171, 177 (Iowa 1991). We are bound by the district court's factual findings if supported by substantial evidence. *Hutchison*, 878 N.W.2d at 229–30. "Substantial evidence supports a factual finding when the finding 'may be reasonably inferred from the evidence presented.'" *Id.* (quoting *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996)). However, "neither the district court's conclusions of law nor its

application of its legal conclusions is binding on appeal." *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004).

The underlying facts in this case are not in dispute. Both the January 24 and November 30 closed sessions were recorded and transcribed. The parties agree on what was said during each session. The questions before us are whether the discussion that occurred during the January session, as a matter of law, exceeded the scope of the exception set forth in Iowa Code section 21.5(1)(*i*), and whether the discussion during the November session involved records that were "required or authorized by state or federal law to be kept confidential" under Iowa Code section 21.5(1)(*a*). Both are legal questions to be answered by the court.

A.

In January 2022, the board held a meeting to conduct Gausman's evaluation. At Gausman's request, consistent with past practice, the evaluation was to be held in closed session pursuant to Iowa Code section 21.5(1)(*i*), which provides:

> 1. A governmental body may hold a closed session only by affirmative public vote of either two-thirds of the members of the body or all of the members present at the meeting. A governmental body may hold a closed session only to the extent a closed session is necessary for any of the following reasons:
>
> . . . .
>
> *i.* To evaluate the professional competency of an individual whose appointment, hiring, performance, or discharge is being considered when necessary to prevent needless and irreparable injury to that individual's reputation and that individual requests a closed session.

When a governmental body goes into closed session, it "shall not discuss any business during a closed session which does not directly relate to the specific reason announced as justification for the closed session." *Id.* § 21.5(2).

The primary issue before us is whether the board's discussion of Gausman's alleged ethical violations directly related to the board's assessment and evaluation of Gausman's professional competency. We conclude that the discussions fell squarely within the announced justification for the closed session. As a general matter, an employee's compliance with ethical and professional norms related to the position is directly related to an employee's competence and performance in the position. Although that conclusion does not need evidentiary support, the conclusion was in fact supported by the evaluation matrix the board used here. The board's superintendent evaluation policy (board policy 301) expressly included "Ethics and Professional Norms" among the minimum leadership standards for evaluation. The policy also makes clear that the formal evaluation criteria "supports" and in no way "preclude[s] the ongoing, informal evaluation of the Superintendent's skills, abilities and competence." We emphasize that our discussion of the specific evaluation matrix used here is not meant to suggest that a governmental body is limited to discussing in closed session only those items identified in its printed evaluation materials. Instead, it just demonstrates that the discussion here did not even fall outside the scope of the board's written performance evaluation materials.

The district court reached a contrary conclusion. It found that the board's discussion was not directly related to performance but instead was related to an investigation and potential complaint. We respectfully disagree. The district court drew a distinction between evaluating an employee's professional competency and investigating potential misconduct. We understand the apparent force of that distinction. An evaluation and an investigation are not identical in purpose or form. But the question under section 21.5(2) is not whether the discussion constituted a formal evaluation or some other category

of employer activity. The question is whether the discussion "directly relate[d] to the specific reason announced as justification for the closed session"—here, the evaluation of Gausman's professional competency. *Id.* When a board raises concerns about specific instances of an employee's conduct, considers whether that conduct comports with professional and ethical standards, and deliberates about what steps to take in response, it is engaged in the ongoing work of evaluating the employee's professional competency, even if the deliberation also touches on potential next steps such as consulting legal counsel. The fact that a discussion may lead to or contemplate disciplinary or investigative action does not negate its evaluative character. Performance evaluations can routinely surface concerns that require follow-up, and the Act does not require the board to sever one from the other.

Gausman argues that the first half of the meeting nonetheless should not have occurred in closed session because he did not anticipate this topic would be discussed and because he did not consent to the specific discussion. Stated differently, Gausman contends that the meeting notice should have contained additional information to identify the specific items that would have been discussed in the closed session. Gausman argues that "knowing and informed consent to a government's closed session . . . is vital to the person requesting the closed meeting." Gausman argues that if he had known the Des Moines conversations would be discussed in the first portion of the meeting, he would not have agreed to the session being closed and would have wanted the opportunity to respond.

We note that Gausman's challenge under the Open Meetings Act is distinct from any claim that he was denied the opportunity to participate in the first portion of the closed session. The Act regulates public access to governmental

proceedings; it does not govern the internal procedures by which a governmental body conducts an evaluation or the extent to which the person being evaluated participates. Whether Gausman should have been present during the board-only portion of his evaluation is a question of employment process, not open meetings law. Our analysis is confined to whether the discussion that occurred during the closed session directly related to the announced justification for the closure.

In any event, Gausman's contention that he was entitled to notice and an opportunity to respond is not supported by the statute. The Act does not require that the specific items to be discussed in the closed session be specified. It requires only that the meeting notice contain a "reference to a specific exemption under this section" that authorized closing the meeting to the public. *Id.* The Act does not require the person being evaluated to consent to the specific performance-related topics being discussed at the closed session. It requires only that the individual "requests" the closed session. *Id.* § 21.5(1)(*i*). The Act does not require the person being evaluated to be present during the evaluation. It requires only that the governmental body limit its discussions to those matters directly related to the announced reason for closure, which, as discussed above, this board did. We do not doubt that Gausman would have preferred in hindsight to be present during the contested portion of the meeting so that he could have an opportunity to tell his side of the story. However, the evaluation exception does not guarantee Gausman that opportunity.

Our recent decision in *Teig v. Hart* also undermines Gausman's argument. 28 N.W.3d 272 (Iowa 2025). There, a city council convened a closed session "[t]o evaluate the professional competency of an individual whose . . . hiring . . . [was] being considered." *Id.* at 277 (quoting Iowa Code § 21.5(1)(*i*)). The issue presented in that case was whether the council could close a job interview at the candidate's

request under section 21.5(1)(*i*) without first making an evidence-based finding that reputational harm would occur from an open session. *Id.* at 277–78. In concluding that the closed session complied with the Act, we explained that it would be unreasonable and unworkable to expect governmental bodies to oscillate in and out of closed session depending on how a conversation unfolds. *Id.* at 278. Interpreting the statute to require that "a *performance* review of a city manager or a school superintendent . . . go step by step, with a segment closed if it related to something that might be notably harmful to the individual's reputation and open otherwise," we said, would be "absurd." *Id.* (quoting *Tel. Herald, Inc. v. City of Dubuque*, 297 N.W.2d 529, 532 (Iowa 1980) (en banc)). We explained that "[t]he statute contemplates a single session ('a closed session')" to "evaluate the professional competency of an individual," not a patchwork of open and closed sessions. *Id.*

The same considerations are relevant here with respect to Gausman's notice and consent arguments. Gausman requested the board go into closed session to discuss his performance to avoid potential injury to his reputation. The statute does not require the board to itemize the specific topics it intends to raise or to oscillate in and out of closed session as new topics surface to obtain the evaluated person's approval. Rather, as we explained in *Teig*, section 21.5(1)(*i*) contemplates a single, predetermined closed session to evaluate professional competency because the board cannot anticipate what topics may surface. *See id.*; *see also State v. Bd. of Educ. of Unified Sch. Dist. No. 305*, 764 P.2d 459, 461 (Kan. Ct. App. 1988) (explaining that, for closed session to discuss personnel matters, "to segregate the topics into open and closed sessions would have been very burdensome and impractical").

Gausman also argues that the board's decision during the January meeting to consult outside legal counsel constituted an improper "final action" taken during closed session. To the extent he raises this as a separate violation of the Act, the issue is not preserved. Whether a governmental body improperly took final action in closed session would implicate Iowa Code section 21.5(3), but Gausman did not raise the issue until his posttrial briefing, and the district court did not rule on it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537–38 (Iowa 2002). To the extent Gausman instead contends that the board's decision to seek legal advice bears on whether the discussion fell outside the scope of section 21.5(1)(*i*), that argument also fails. Reaching a consensus about next steps in response to concerns raised during a performance evaluation does not transform the nature of the underlying discussion. We cannot say that the board was prohibited from addressing all aspects of Gausman's performance in his role as superintendent under section 21.5(1)(*i*).

The Act's general policy favoring transparency does not compel a different result. "We adhere to our view that the open meetings law is to be liberally construed." *Teig*, 28 N.W.3d at 280 (quoting *Donahue v. State*, 474 N.W.2d 537, 539 (Iowa 1991) (en banc)). This canon of construction, codified in Iowa Code section 21.1, instructs that "[a]mbiguity in the construction or application of this chapter should be resolved in favor of openness." We take that directive seriously. But it presupposes the existence of an ambiguity. Where the statutory text is sufficiently clear, the canon does not come into play. Here, section 21.5(1)(*i*) authorizes closure to "evaluate the professional competency" of an individual. *Id.* § 21.5(1)(*i*). For the reasons we have explained, the board's discussion of Gausman's ethical conduct fell within that authorization as a matter of ordinary

meaning. Because we find no ambiguity in the application of the statute to the facts of this case, the canon does not alter our analysis.

Our conclusion that the board complied with the law here is consistent with decisions from other jurisdictions addressing the scope of similar open meetings exceptions. For example, in *Duval v. Board of Trustees of the Coalinga–Huron Joint Unified School District*, the board noticed a closed meeting to evaluate the superintendent's performance but instead spent the session discussing the form that would be used for the evaluation. 113 Cal. Rptr. 2d 517, 519–20 (Ct. App. 2001). The California Court of Appeal rejected an overly narrow construction of the state's performance evaluation exception and held that "evaluation of performance" is not "limited to the annual or periodic comprehensive, formal, and structured review of job performance commonly envisioned in a typical personnel manual or employment contract." *Id.* at 523. According to the court, an "evaluation of performance" may encompass "a review of an employee's job performance even if that review involves particular instances of job performance rather than a comprehensive review of such performance." *Id.* It may also "properly include consideration of the criteria for such evaluation, consideration of the process for conducting the evaluation, and other preliminary matters, to the extent those matters constitute an exercise of defendant's discretion in evaluating a particular employee." *Id.*

In *Meyer v. Board of Regents of the University of Nebraska*, the board of regents closed a meeting pursuant to Nebraska law to "evaluate[] and consider[] the employment status of the president." 510 N.W.2d 450, 452 (Neb. Ct. App. 1993). During that session, the board discussed and negotiated the president's separation of employment and also addressed the appointment of an interim president to ensure continuity of leadership following the resignation. *Id.* at 453.

On appeal, the court rejected the argument that appointment of interim leadership was not a proper topic for the closed session. *Id.* at 458. Because the primary purpose of the closure—to consider the president's employment—was authorized, the board was permitted to engage in "any necessary discussion of incidental matters," including who would fill the resulting vacancy. *Id.* at 455.

In *Commercial Printing Co. v. Rush,* the Arkansas Board of Corrections entered closed session to discuss the possible dismissal or discipline of employees in connection with an inmate's death. 549 S.W.2d 790, 792–93 (Ark. 1977) (en banc). The board discussed various other prison policies during the closed session. *Id.* The Arkansas Supreme Court held that the other discussions did not render the closed session illegal because they occurred "within an overall general context of whether there had been any violation of board policies and procedures within which public disciplinary or other public action should be taken." *Id.* at 794. Discussions about dismissal or discharge could of necessity deal with several areas which, taken out of the context of the total discussion, might be construed as improper subject matter for the closed session. *See id.*

We hold that it was proper for the board to discuss in closed session its concerns regarding Gausman's conduct during a meeting to evaluate his professional competency and performance in the job. The board was responsible for supervising and evaluating Gausman's performance on an ongoing basis, and that responsibility necessarily encompassed consideration of specific instances of conduct arising over the course of his tenure and discussions about how to address performance-related concerns. Nothing in the board's own policy limited the evaluation to the topics enumerated in the formal rubric or prohibited the board from raising other concerns. Once an employee requests that an evaluation be conducted in closed session, the Act does not require governmental bodies to

compartmentalize their discussion in a manner that undermines the evaluation's practical function.

B.

We turn now to Gausman's cross-appeal. On cross-appeal, Gausman argues that the district court erred in finding that the November 30 closed session was lawful under Iowa Code section 21.5(1)(*a*). That section permits a governmental body to hold a closed session "[t]o review or discuss records which are required or authorized by state or federal law to be kept confidential or to be kept confidential as a condition for that governmental body's possession or continued receipt of federal funds." *Id.* It is undisputed that a filed IBOEE complaint would fall within the scope of the exception. The issue is whether a not-yet-filed complaint is confidential and can therefore be properly discussed in a session closed pursuant to section 21.5(1)(*a*).

The district court concluded that the board's discussion during the November meeting of Greenwell's rejected complaint and proposition to substitute it with a new, substantively identical complaint following board approval was one "required or authorized by . . . law to be kept confidential." *Id.* In reaching that conclusion, the court relied on Iowa Code section 272.13(3) (now codified at Iowa Code section 256.158(3) (2024), *see* 2023 Iowa Acts ch. 19, § 2603), which governs confidentiality in hearings before the IBOEE and provides:

> All complaint files, investigation files, other investigation reports, and other investigative information in the possession of the board or its employees or agents, which relate to licensee discipline, are privileged and confidential, and are not subject to discovery, subpoena, or other means of legal compulsion for their release to a person other than the respondent and the board and its employees and agents involved in licensee discipline . . . .

*Id.*

Resolution of this question requires us to consider the framework we established for analyzing the scope of similar confidentiality provisions. On its face, section 272.13(3) applies only to those documents in the possession of the IBOEE. However, we rejected a strict possession approach when interpreting a similar confidential records provision in *Hall v. Broadlawns Medical Center*. 811 N.W.2d 478 (Iowa 2012). *Hall* involved the nondisclosure of an internal audit report under Iowa's Open Records Act after the audit was provided to the Iowa Board of Pharmacy in connection with an investigation. *Id.* at 481–82. We interpreted Iowa Code section 272C.6(4)(*a*), a confidentiality provision nearly identical to section 272.13(3), which applies to "all complaint files, investigation files, other investigation reports, and other investigative information in the possession of a licensing board or peer review committee." *Id.* at 482 (quoting Iowa Code § 272C.6(4) (2009)). In determining whether the audit provided to the licensing board qualified as a confidential record, we identified three categories of records:

> The first category consists of documents ordinarily generated by the organization that reflect internal deliberations and functions of the reviewing body. These documents are at the core of statutory protection. We have held that such documents are privileged under Iowa Code section 272C.6(4).
>
> The second category of documents . . . is comprised of preexisting documents that are submitted to the reviewing body. The case for statutory privilege with respect to these documents in the hands of a third party is weak. The need for frankness does not justify protecting preexisting documents because the documents were generated before the investigation commenced.
>
> The third category of documents . . . includes those created for the purpose of submission to the reviewing body. . . . "[J]ust as the core protection of documents generated by the committee encourages frankness during the committee's deliberations, this extension promotes candid submissions to the committee."

*Id.* at 484 (citations omitted) (quoting Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence* § 7.8.2, at 1376–77 (2d ed. 2010)). Because the audit was not "created for the purpose of submission" to the pharmacy board but was rather created for a separate purpose and submitted to the board after-the-fact, we held that the audit was a category two record and was not confidential. *Id.* at 484–85.

Applying these categories to the case before us, we hold that the board's discussion about the rejected complaint and subsequent replacement complaint to be filed with the IBOEE was a discussion about records "required or authorized by [section 272.13(3)] to be kept confidential," Iowa Code § 21.5(1)(*a*), because they were "created for the purpose of submission to the reviewing body," *Hall*, 811 N.W.2d at 484. As we explained in *Hall*, if a complaint is created for filing with a licensing board, "it seems doubtful that the document in the hands of the licensing board is confidential, but the very same document in the possession of the person who provided the complaint or in the hands of a challenged professional responding to the complaint, is not." *Id.* at 483. The district court did not err in holding that the November meeting complied with chapter 21.

## III.

We hold that the board's January 24, 2022 closed session did not violate the Open Meetings Act. The district court's contrary ruling is reversed. Because we find no violation of chapter 21 with respect to the January session, there is no basis for awarding Gausman attorney fees and costs, and we reverse the district court's order on those issues. On the cross-appeal, we affirm the district court's ruling that the November 30, 2022 closed session did not violate Iowa Code chapter 21.

**Appeal Reversed; Cross-Appeal Affirmed.**