**MEL FRANK TOOL & SUPPLY, INC., Appellee,**

v.

**DI–CHEM COMPANY, Appellant.**

No. 97–98.

Supreme Court of Iowa.

July 1, 1998.

803

Kristopher K. Madsen of Stuart, Tinley, Peters, Thorn & Hughes, Council Bluffs, for appellant.

David E. Richter and Larry Melcher, Council Bluffs, and Robert L. O'Brien, Council Bluffs, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

City authorities informed a lessee, a chemical distributor, that it could no longer use its leased premises to store its hazardous chemi-

cals because of a recently enacted ordinance. The lessee vacated the premises, and the lessor sued for breach of the lease and for damages to the premises. The district court awarded the lessor judgment for unpaid rent and for damages to the premises. The lessee appeals, contending that the district court should have found that the city's actions constituted extraordinary circumstances rendering the performance of the lease impossible. The lessee also contends that language in the lease releases it from liability. In addition, the lessee challenges a district court finding that a real estate agent represented the lessee and prepared the lease on its behalf. We affirm.

## I. *Facts.*

Di–Chem Company is a chemical distributor. In May 1994, Di–Chem began negotiating with Mel Frank Tool & Supply, Inc. to lease a storage and distribution facility in Council Bluffs, Iowa. Mel Frank's real estate agent handled the negotiations so there were no actual face-to-face negotiations between the parties. However, a day before the lease was executed, Mel Frank's owner, Dennis Frank, talked with Di–Chem representatives who were touring the premises. Frank asked them what Di–Chem was going to be selling and was told chemicals. The agent brought the lease to Frank for his signature.

The lease appears to be an Iowa State Bar Association form. *See* Iowa State Bar Association Official Form No. 164. The lease was to start June 1, 1994 and end May 31, 1997. The lease limited Di–Chem's use of the premises to "storage and distribution."

Some of the chemicals Di–Chem distributes are considered "hazardous material." There was no testimony that Dennis Frank was aware of this at the time the lease was executed. A Di–Chem representative, who was present during the earlier-mentioned conversation with Dennis Frank, testified that hazardous materials did not come up in the conversation.

The lease contained several provisions that bear on the issues in this appeal. One requires Di–Chem to "make no unlawful use of the premises and ... to comply with all ... City Ordinances." There is also a destruc-tion-of-premises provision that allows either party to terminate the lease under certain circumstances.

On July 21, 1995, the city's fire chief and several other city authorities inspected the premises. Following the inspection, the city's fire marshal wrote Di–Chem, stating:

> At the time of the inspection the building was occupied as Hazardous Materials Storage. I have given you a copy of 1994 Uniform Fire Code, which the City has adopted, covering Hazardous Material Storage. As you can see the building does not comply with the Code requirements which creates Health and Life Safety Hazards. The Hazardous Materials must be removed within seven (7) days to eliminate the hazard.

The letter also informed Di–Chem of the following code deficiencies: complete fire sprinkler system, mechanical exhaust system, spill control, and drainage control. Both Frank and Di–Chem representatives testified they understood the letter to mean that if these deficiencies were eliminated, Di–Chem could continue to store hazardous material. There was testimony that the changes in the code occurred after Di–Chem took occupancy of the premises.

On August 2 Di–Chem informed Mel Frank by letter of the city's action and enclosed a copy of the city's July 25 letter to Di–Chem. In its August 2 letter Di–Chem informed Mel Frank of its intention to relocate "as soon as possible to avoid civil and criminal proceedings at the hands of the city." Di–Chem also stated

> we believe the city has overreacted and probably has no authority to order us to remove our materials from the property.... Nevertheless, we are not willing to contest the city's position, and we feel compelled to remove our operation beyond the city limits.

Di–Chem also stated it intended to pay the rental for the month of August and vacate the premises by September 1.

Thereafter Dennis Frank and Di–Chem representatives met with city officials about what it would take to correct the various code deficiencies to allow Di–Chem to contin-

ue storing hazardous materials. Di–Chem representatives and Dennis Frank briefly considered bringing the building up to code. There was talk about the possibility of Di–Chem splitting the costs with Mel Frank, but Dennis Frank felt the cost was prohibitive.

On October 23 Di–Chem notified Mel Frank by letter of its intention to vacate the premises by the end of October. The letter in part stated: "The city's position that we cannot legally store all of our inventory at this site prior to extensive alteration of the building makes the structure useless to us as a chemical warehouse." True to its word, Di–Chem vacated the premises.

## II. *Proceedings.*

Later, Mel Frank sued for breach of the lease and for damages to the property. Di–Chem asserted several affirmative defenses: mutual mistake, illegal contract, failure to mitigate damages, fraud in the inducement, and impossibility.

The parties tried the case to the court. In its ruling the court stated the issue this way:

> The principal issue to be determined is whether the defendant may voluntarily terminate the lease agreement based upon defendant's position that the warehouse could not be used for storing hazardous materials [resulting from] the inspection of various departments of the City of Council Bluffs. The conclusion of this issue must be based upon the intention of the litigating parties as well as the terms and conditions of the written lease agreement.

The court found for Mel Frank. The court found that Mel Frank had "no reason to believe or [know] that chemicals classified as hazardous would be stored in the warehouse." The court relied on the testimony of Norm Wirtala, an officer of Di–Chem:

> Mr. Wirtala testified he would be in a "superior position of knowledge" concerning the items to be stored in the building and that he had a general understanding of fire code requirements for the storage of hazardous materials due to his experience in the business although [neither] he nor his agents claimed to have examined the Council Bluffs' fire codes as they may have

related to hazardous materials and building specifications for storage of hazardous materials.

With this the court concluded that there was clear and conclusive [evidence] that the plaintiff made no representations to the defendant that the warehouse was suitable for any specific purpose, nor were any discussions or representations made concerning the character of the products to be stored by the defendant. Consequently, this Court concludes the lease was breached by the defendants for vacating the premises and failing to pay the balance of the lease term as required by its terms and conditions and the defendants owe the sum of $55,913.77 for rent [and $2,357.00 for damage to the property].

## III. *Scope of Review.*

The action here was one at law. Our review is therefore for correction of errors. Iowa R.App. P. 4. The district court's findings of fact have the force of a special jury verdict and are binding if supported by substantial evidence. *See* Iowa R.App. P. 14(f)(1). Evidence is substantial if a reasonable mind could find it adequate to reach the same finding. *Pierce v. Farm Bureau Mut. Ins. Co.,* 548 N.W.2d 551, 553 (Iowa 1996). We are not, however, bound by the district court's application of legal principles or the court's conclusions of law. *Hagan v. Val–Hi, Inc.,* 484 N.W.2d 173, 175 (Iowa 1992).

## IV. *Impossibility of Performance.*

**A. *The law.*** The introduction to the Restatement (Second) of Contracts covers impossibility of performance but with a different title: impracticability of performance and frustration of purpose. *See* Restatement (Second) of Contracts ch. 11, at 309 (1981) [hereinafter Restatement]. According to the Restatement,

> [c]ontract liability is strict liability.... The obligor is therefore liable in damages for breach of contract even if he is without fault and even if circumstances have made the contract more burdensome or less desirable than he had anticipated.... The obligor who does not wish to undertake so extensive an obligation may contract for a

lesser one by using one of a variety of common clauses: ... he may reserve a right to cancel the contract.... The extent of his obligation then depends on the application of the rules of interpretation....

*Id.*

■ Even though the obligor has not restricted his or her obligation by agreement, a court may still grant relief: "An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." *Id.* In these circumstances, "the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable." *Id.* at 310. Whether extraordinary circumstances exist justifying discharge is a question of law for the court. *Id.*

The Restatement recognizes three distinct grounds for the discharge of the obligor's contractual duty:

First, the obligor may claim that some circumstance has made his own performance impracticable.... Second, the obligor may claim that some circumstance has so destroyed the value to him of the other party's performance as to frustrate his own purpose in making the contract.... Third, the obligor may claim that he will not receive the agreed exchange for the obligee's duty to render that agreed exchange, on the ground of either impracticability or frustration.

*Id.*

■ The rationale behind the doctrines of impracticability and frustration is whether the nonoccurrence of the circumstance was a basic assumption on which the contract was made. *Id.* at 310–11. The parties need not have been conscious of alternatives for them to have had a "basic assumption." *Id.* at 311. The Restatement gives an example: Where an artist contracts to paint a painting and dies, the artist's death is an "event the nonoccurrence of which was a basic assumption on which the contract was made, even though

the parties never consciously addressed themselves to that possibility." *Id.*

Under the Restatement's rationale,

the obligor is relieved of his duty because the contract, having been made on a different "basic assumption," is regarded as not covering the case that has arisen. It is an omitted case, falling within a "gap" in the contract. Ordinarily, the just way to deal with the omitted case is to hold that the obligor's duty is discharged, in the case of changed circumstances, or has never arisen, in the case of existing circumstances, and to shift the risk to the obligee.

*Id.*

■ **B.** *Discharge by supervening frustration.* For reasons that follow, we think the facts of this case fall within the parameters of section 265 of the Restatement. Section 265 provides:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, *unless the language or the circumstances indicate the contrary.*

(Emphasis added.) As mentioned, this is one of the three grounds the Restatement recognizes for discharging the obligor's contractual duty. *See id.* ch. 11, at 310.

■ The rule deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating the purpose in making the contract. *Id.* § 265 cmt. a, at 335. The obligor's contractual obligation is discharged only if three conditions are met:

First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. *Second, the frustration must be substantial. It is not enough that the transaction has become*

*less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract.* Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.... The foreseeability of the event is ... a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption.

*Id.* (emphasis added).

Under this Restatement section, the following pertinent illustration appears:

A leases a gasoline station to B. A change in traffic regulations so reduces B's business that he is unable to operate the station except at a substantial loss. B refuses to make further payments of rent. If B can still operate the station, even though at such a loss, his principal purpose of operating a gasoline station is not substantially frustrated. B's duty to pay rent is not discharged, and B is liable to A for breach of contract. The result would be the same if substantial loss were caused instead by a government regulation rationing gasoline or a termination of the franchise under which B obtained gasoline.

*Id.* § 265 cmt. a, illus. 6, at 336.

Iowa case law is in accord with Restatement section 265. *See Conklin v. Silver*, 187 Iowa 819, 822–23, 174 N.W. 573, 574 (1919). The facts in *Conklin* parallel those in illustration 6 set out above.

In *Conklin,* the lease provided that the lessees were "to only use the premises for iron, metal, and rag business." *Id.* at 820, 174 N.W. at 573. The lease also prohibited the lessees from "engag[ing] in or permit[ting] any unlawful business on the premises, nor to permit the premises to be occupied for any business deemed extra hazardous on account of fire." *Id.*

About a month into the lease, the Iowa legislature passed a statute declaring as a nuisance the storage of rags "within the fire limits of any city, unless it be in a building of fireproof construction." *Id.* at 821, 174 N.W. at 573. The statute applied to the lessees because the premises were within the fire limits of the city and were not of fireproof construction. *Id.* For this reason, the lessees claimed the statute made its business unlawful, exposed them to criminal prosecution, and deprived them of any substantial or beneficial use of the property thereby releasing them from further obligation to pay rent. *Id.*

This court rejected the lessees' contention and affirmed a directed verdict in favor of the plaintiff-lessor for the unpaid rent. There was evidence that the lessee also dealt in junk metal. For this reason the court concluded:

Altogether, we are satisfied that, while the operation of the statute mentioned served to narrow or restrict, to some extent, the scope of the business of the lessees, we think the evidence is insufficient to sustain a finding that it deprives them of the beneficial use of the leased property; and, as the defense is an affirmative one, the burden of establishing which is upon the party pleading it, the trial court did not err in refusing to submit it to the verdict of the jury.

*Id.* at 822, 174 N.W. at 574. The court continued:

[T]he right to buy, sell, store, and ship junk metals of all kinds, not only in the building but upon the entire lot, is not, in any sense, a mere incident of the rag business, and that a loss of the privilege of using the building for the handling of rags does not deprive the lessees of the beneficial enjoyment of the property for the other specified uses. It may possibly render the use less valuable or less profitable, but there is no rule or principle of law which makes that fact a matter of defense or of counterclaim in an action upon the lease.

*Id.* at 822–23, 174 N.W. at 574.

The Restatement and *Conklin* represent the prevailing view:

The parties to a lease may lawfully agree or stipulate that if by reason of a subsequent prohibitory or restrictive statute, ordinance, or administrative ruling,

the tenant is prevented from legally using the premises for the purpose for which it was contemplated, the tenant may surrender or terminate the lease for which it was contemplated and be relieved from further liability for rent. In the absence of such a provision for termination, however, there is some uncertainty as to the effect of subsequent legal prohibition or restriction on the use of the premises. *It may generally be said that in the absence of any such stipulation, a valid police regulation which forbids the use of rented property for certain purposes, but leaves the tenant free to devote the property to other legal uses not forbidden or restricted by the terms of the lease, does not invalidate the lease or affect the rights and liabilities of the parties to the lease. And, even though the lease by its terms restricts the tenant's use of the premises to certain specified purposes, but not to a single purpose, the prevailing view is that the subsequent enactment of the legislation prohibiting the use of the premises for one, or less than all, of the several purposes specified does not invalidate the lease or justify the tenant in abandoning the property, even though the legislation may render its use less valuable. If there is a serviceable use for which the property is still available consistent with the limitations of the demise, the tenant is not in a position to assert that it is totally deprived of the benefit of the tenancy.*

49 Am.Jur.2d *Landlord & Tenant* § 531, at 442–43 (1995) (emphasis added).

Based on the foregoing authorities, we reach the following conclusions. A subsequent governmental regulation like a statute or ordinance may prohibit a tenant from legally using the premises for its originally intended purpose. In these circumstances, the tenant's purpose is substantially frustrated thereby relieving the tenant from any further obligation to pay rent. The tenant is not relieved from the obligation to pay rent if there is a serviceable use still available consistent with the use provision in the lease. The fact that the use is less valuable or less profitable or even unprofitable does not mean the tenant's use has been substantially frustrated.

**C. *The merits.*** It is clear from the pleadings and testimony that Di–Chem was asserting a defense of frustration of purpose. Di–Chem had the burden of persuasion to prove that defense. *See Conklin,* 187 Iowa at 822, 174 N.W. at 574. The district court's decision in favor of Mel Frank is a determination that Di–Chem did not carry its burden on this defense.

Di–Chem produced no evidence that *all* of its inventory of chemicals consisted of hazardous material. In fact, its own correspondence to Mel Frank indicates otherwise. For example, Di–Chem's October 23 letter to Mel Frank stated: "The city's position that we cannot legally store *all* of our inventory at this site prior to extensive alteration of the building makes the structure useless to us as a chemical warehouse." (Emphasis added.) A reasonable inference from this statement is that not all of Di–Chem's inventory consisted of hazardous material.

Testimony from one of Di–Chem's representatives corroborates this inference:

Q. Were you involved at all in the discussions with the City of Council Bluffs relative to the various code deficiencies that existed at the building? A. My involvement was that the city had pointed out that there was some deficiencies with the building and asked us to remove *what* chemicals they found objective.

(Emphasis added.) Another Di–Chem representative testified that Di–Chem's product line included industrial chemicals and *food additives.* Presumably, food additives are not hazardous materials.

Given the posture of this appeal, Di–Chem has to establish as a matter of law that its principal purpose for leasing the facility—storing and distributing chemicals—was substantially frustrated by the city's actions. Di–Chem presented no evidence as to the nature of its inventory and what percentage of the inventory consisted of hazardous chemicals. The company also failed to show what its lost profits, if any, would be without the hazardous chemicals. Thus, there is no evidence from which the district court could have found the city's actions substantially

frustrated Di–Chem's principal purpose of storing and distributing chemicals. Put another way, there is insufficient evidence that the city's action deprived Di–Chem of the beneficial enjoyment of the property for other uses, i.e., storing and distributing nonhazardous chemicals.

Simply put, Di–Chem failed to establish its affirmative defense of what it has termed impossibility. We must therefore affirm the district court's decision as to this issue.

### V. *Lease Language.*

■ Di–Chem also relies on language in the lease which it claims releases it from further obligation to pay rent. The language is found in clause 13 of the lease, which is entitled "Fire and Casualty, Partial Destruction of Premises," and provides:

(a) In the event of a partial destruction or damage of the leased premises, which is a business interference, that is, which prevents the conducting of a normal business operation and which damage is reasonably repairable within sixty (60) days after its occurrence, this lease shall not terminate but the rent for the leased premises shall abate during the time of such business interference. In the event of partial destruction, Landlord shall repair such damages within 60 days of its occurrence unless prevented from so doing by acts of God, the elements ... or other causes beyond Landlord's reasonable control.

(b) **Zoning.** Should the zoning ordinance of the city ... make it impossible for Landlord, using diligent and timely effort to obtain necessary permits and to repair and/or rebuild so that Tenant is not able to conduct its business on these premises, then such partial destruction shall be treated as a total destruction as in the next paragraph provided.

(c) **Total Destruction of Business Use.** In the event of a destruction or damage of the leased premises ... so that Tenant is not able to conduct its business on the premises or the then current legal use for which the premises are being used and which damages cannot be repaired within sixty (60) days this lease may be terminated at the option of either the Landlord or Tenant. Such termination in such event shall be effected by written notice of one party to the other, within twenty (20) days after such destruction. Tenant shall surrender possession within ten (10) days after such notice issues, and each party shall be released from all future obligations hereunder....

Di–Chem contends that because it was not able to store and distribute the hazardous chemicals, it was "not able to conduct its business on the premises," as specified in clause 13(b). Di–Chem concludes, therefore, that a "total destruction of business use" occurred in accordance with clause 13(c) and for that reason each party was released from all future obligations under the lease.

There is not even a hint of recognition of clause 13 in the district court's ruling. The reason is obvious: clause 13 simply does not apply to the facts of this case. Clause 13 must be read in its entirety and construed in context.

As the title in clause 13 suggests, the clause's language covers the situation where there has been a temporary interruption of the tenant's business because of a partial destruction of the premises. In these circumstances, the lease gives the landlord a period of time to repair or rebuild. During this period the tenant's rent abates but the lease continues in force.

Clause 13 also covers the situation where the landlord cannot rebuild or repair the premises because of some zoning prohibition. A common example involves a nonconforming use. Typically, zoning ordinances prohibit an owner from rebuilding if, for example, fifty percent of the building has been destroyed. In these circumstances, the tenant cannot legally continue in business on the premises and for this reason the lease considers the tenant's business use has been totally destroyed. In this situation, both the landlord and the tenant have the option to terminate the lease with no further obligation on either's part.

One cannot reasonably interpret clause 13 to cover the situation where a subsequent governmental regulation prohibits the use of the premises for one of several purposes specified in the lease. The district court was correct in ignoring clause 13.

## VI. *District Court Finding That Real Estate Agent Represented Di–Chem.*

We agree with Di–Chem that the district court erroneously found that the real estate agent represented Di–Chem and prepared the lease on its behalf. There is no evidence to support such a finding; in fact, the evidence is the other way. Nevertheless, we find the error harmless, because Di–Chem has not established any ambiguity in the terms of the lease that affect the outcome of this case. Thus, there was simply nothing to construe against Mel Frank. *See Iowa Fuel & Minerals, Inc. v. Board of Regents,* 471 N.W.2d 859, 862–63 (Iowa 1991) (holding that ambiguities in a contract are construed against the drafter).

## VII. *Disposition.*

In sum, we conclude Di–Chem has failed to establish—as a matter of law—that it is entitled to relief via its impossibility defense or the terms of the lease. The district court's erroneous finding that the real estate agent represented Di–Chem was harmless. We affirm.

**AFFIRMED.**