# IN THE COURT OF APPEALS OF IOWA

No. 23-0934
Filed October 16, 2024

**SCOTT MOTTER,**
　　Plaintiff-Appellant/Cross-Appellee,

**vs.**

**ALL THE CATS, LLC,**
　　Defendant-Appellee/Cross-Appellant,

**and**

**GHOST LOUNGE, LLC and LARRY MASON JR.,**
　　Defendants-Appellees.
_____

**ALL THE CATS, LLC,**
　　Counterclaim/Cross-Claim Plaintiff,

**vs.**

**GHOST LOUNGE, LLC, SCOTT MOTTER, and LARRY MASON JR.,**
　　Counterclaim/Cross-Claim Defendants.
_____

　　Appeal from the Iowa District Court for Polk County, Coleman McAllister, Judge.

　　The parties appeal the judgment entered following nonperformance of a commercial lease agreement. **AFFIRMED AND REMANDED.**

　　David J. Hellstern and Jeffrey P. Schultz of Sullivan & Ward, P.C., West Des Moines, for appellant.

　　Mollie Pawlosky of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee All the Cats, LLC.

　　Valerie Cramer of Cramer Law PLC, Des Moines, for appellee Larry Mason Jr.

　　Heard by Tabor, P.J., and Chicchelly and Sandy, JJ.

**CHICCHELLY, Judge.**

Two parties to a commercial lease agreement signed just before the COVID-19 global pandemic reached Iowa appeal and cross-appeal the judgment entered by the district court for nonperformance.  On appeal, we consider (1) whether the emergency proclamations issued due to the pandemic frustrated the purpose of the lease and excused the breaching party's nonperformance, (2) whether the assignment of the lease to a third party and a settlement agreement entered with that third party terminated the breaching party's duties under the original lease, (3) whether the property owner wrongfully converted the breaching party's deposit for the benefit of a third party, and (4) whether the court erred in interpreting a lease provision about when the first rent payment was due.  We also consider whether the district court erred by awarding trial attorney fees and whether to award appellate attorney fees.  After reviewing the claims before us, we affirm the judgment and remand to the district court to determine an award of reasonable appellate attorney fees.

**I. Background Facts and Proceedings.**

Scott Motter and Larry Mason Jr. planned to open a restaurant and bar together in Des Moines.  They signed a written partnership agreement and formed Ghost Loungz, LLC (Ghost Loungz) in February 2020 for that purpose.

Ghost Loungz leased a two-story commercial space from All the Cats, LLC (ATC) "for the sole purpose of a high class full service restaurant and lounge providing food and beverages."  The 7200 square-foot space included a kitchen, bar, lounge area, and stage on the first floor and a "rooftop bar" on the second floor.  The term of the lease was five years and one and one-half months, beginning

February 19, 2020, and ending March 31, 2025. The lease required that Ghost Loungz pay ATC $11,000 per month for eight months of the year. Because Iowa's weather inhibits operating the rooftop bar from November through February, the lease payments would lower to $9000 during those four months. Both Motter and Mason personally guaranteed Ghost Loungz's performance of the lease.

After signing the lease, Ghost Loungz began renovating the space with plans to open on April 1. Those renovations were underway when the COVID-19 global pandemic reached Iowa mid-March. In response to the pandemic, the State of Iowa issued emergency proclamations that limited the operation of food-service establishments to carry-out, drive-through, and delivery services.

Ghost Loungz never completed the renovations or opened its doors as a restaurant and bar, and Motter and Mason's business and personal relationships ended. On April 6, Motter emailed ATC, requesting to terminate the lease based on the pandemic. Motter hired an attorney who sent ATC an April 30 email stating that the purpose of the lease "has become frustrated, impractical, and currently impossible." The email also stated, "Ghost Loungz, LLC hereby gives notice that it hereby terminates this lease, effective immediately, and requests the return of its security deposit and first month's rent since the lease term has not yet begun."

The emergency proclamations limiting restaurants to carry-out, drive-through, and delivery services continued through April 2020. But starting May 1, Des Moines restaurants were allowed to serve food and beverages on the

premises at 50% of normal operating capacity. Effective June 12, the limit on restaurant capacity was lifted.[1]

After Motter and Mason parted ways, Mason began a partnership with Jose Aquino to open a bar and restaurant called Club 525. On May 30, Mason signed a "Lease Assignment Agreement," stating that Ghost Loungz was assigning its commercial lease to Club 525 starting on that date and ending on October 31, 2023, "unless terminated sooner." The agreement stated that Club 525 would pay $10,000 per month through October 2020, at which time rent would increase to $11,000 per month for eight months per year with a reduced rate of $9000 per month from November through February. The agreement was signed by ATC (as "landlord"), Mason (as "assignor" Ghost Loungz), and Aquino (as "assignee" Club 525).

Club 525 opened during the summer of 2020 and operated until January 2021. A settlement agreement terminated the remaining lease with ATC and released Club 525 from further liability. Since March 2021, ATC has leased the space to a third party.

In December 2020, Motter sued Mason, Ghost Loungz, and ATC. He asked the court to terminate the lease with ATC, order ATC to return to him the $22,000 security deposit paid on behalf of Ghost Loungz, and order ATC to compensate him for damages for conversion and unjust enrichment that resulted when ATC wrongfully held the deposit. Motter also asked the court to dissolve Ghost Loungz and order Mason to compensate him for breach of contract, conversion, and unjust

---

[1] A requirement that establishments maintain at least six feet of distance between tables remained in place.

enrichment of Ghost Loungz assets, and continued use of the Ghost Loungz's name and assets for Club 525's benefit without his permission. ATC counterclaimed and crossclaimed against Ghost Loungz, Motter, and Mason for the rent due under the Ghost Loungz lease and its attorney fees.

After a bench trial in 2023, the district court dismissed Motter's claims against ATC. It dissolved Ghost Loungz and entered judgment for Motter against Mason for unjust enrichment in the amount of $11,447.94. The court dismissed Motter's remaining claims against Mason and entered judgment for ATC against Motter, Mason, and Ghost Loungz in the amount of $109,250 for unpaid rent under the lease, holding them jointly and severally liable. It awarded ATC $58,453.30 in attorney fees and costs.

**II. Scope of Review.**

Our scope of review on appeal is determined by the way the case was tried in district court. *Ernst v. Johnson Cnty.*, 522 N.W.2d 599, 602 (Iowa 1994). We review cases tried in equity de novo and those tried at law for correction of errors at law. *Id.* Although judicial dissolutions under Iowa Code section 489.701(e)(2) (2020) are equitable in nature, *Barkalow v. Clark*, 959 N.W.2d 410, 418 (Iowa 2021), that issue is not before the court on appeal.

The court must determine whether the case is legal or equitable by the pleadings, relief sought, and nature of the case. *Ernst*, 522 N.W.2d at 602. The action was docketed as a law case, but that alone does not determine the scope of our review. *See Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013). Ultimately, it depends on how the trial court considered it. *Ernst*, 522 N.W.2d at 602. "[A] litmus test we use in making this determination is whether

the trial court ruled on evidentiary objections." *Id.* Labeling the ruling a decree also indicates the matter was tried in equity. *Id.*

The record shows, and the parties agree, that this matter was tried at law. Thus, our scope of our review is for correction of errors at law. *Id.* The district court's findings bind us if supported by substantial evidence. *See Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 173 (Iowa 2023). In determining whether substantial evidence supports the district court's findings, the court views the evidence in the light most favorable to the judgment, construing the court's findings liberally to uphold rather than defeat the result. *Hutchison v. Shull*, 878 N.W.2d 221, 230 (Iowa 2016). The question is not whether the evidence supports a different finding but whether it supports the finding made. *Id.* If the district court erroneously applied the law in a way that materially affected its decision, the court may reverse. *Dolly Invs.,* 984 N.W.2d at 173.

### III. Discussion.

Both Motter and ATC appeal the judgment entered by the district court. We address their claims in turn.

### A. Motter's Appeal.

Motter challenges the judgment entered against Ghost Loungz and Motter for breach of contract, the denial of his conversion claim, and the award of ATC's attorney fees. We begin with Motter's arguments about ATC's breach-of-contract claim.

### 1. Breach of Contract.

The district court awarded ATC damages against Ghost Loungz and Motter based on Ghost Loungz's breach of the lease and Motter's personal guaranty of

its performance. Motter concedes that (1) the lease is a valid contract, (2) he personally guaranteed Ghost Loungz's performance of the lease, and (3) Ghost Loungz did not perform the terms of the lease. But he contends that Ghost Loungz's performance is excused because the emergency public health proclamations issued in response to the COVID-19 pandemic frustrated the lease's purpose "of a high class full service restaurant and lounge providing food and beverages" or rendered its performance impractical or impossible. On this basis, he claims that he can terminate the lease on Ghost Loungz's behalf, voiding his guaranty.

Iowa recognizes the doctrine of impossibility of performance, which excuses nonperformance if performance becomes "*objectively* impossible" through no fault of the nonperforming party. *Nora Springs Co-op. Co. v. Brandau*, 247 N.W.2d 744, 747 (Iowa 1976). If a contingency could reasonably have been anticipated, nonperformance will be excused only if the terms of the contract provide for it. *Id.* When impossibility is only temporary, the duty to perform is merely suspended while the impossibility continues. *Id.*

Iowa also recognizes that impracticality of performance and frustration of purpose can discharge an obligor's duty to perform under a contract. *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*, 580 N.W.2d 802, 806 (Iowa 1998). The question is "whether the nonoccurrence of the circumstance was a basic assumption on which the contract was made." *Id.* If the contract was made on a different "basic assumption," the obligor is relieved of their duty because the contract is regarded as not having covered the case that has arisen. *Id.* In other words, the circumstances fall within a "gap" in the contract. *Id.* (citation omitted).

But a party is not relieved of the duty to perform when performance is only partially impracticable. *Id.* "*It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract.*" *Id.* at 807–08 (quoting *Restatement (Second) of Contracts* § 265 (Am. L. Inst. 1981)).

The trial court concluded that Motter failed to show that "the terms of the lease were objectively impossible to perform."

> While there is no doubt it was different than what was intended, there is no evidence that Ghost Loungz could not have transitioned to carry-out dining for a few short months. Even though he bears the burden of proof, Motter has not provided any evidence of what his lost profits, if any, may have been from either operating the restaurant as a carry-out only business or operating it with reduced in-person dining during the times the Governor's proclamations limited the use of the premises. Consequently, Motter has failed to establish that there was not a serviceable use of the premises still available under the Governor's proclamations.

Motter concedes that if impossibility of performance is temporary, the duty to pay rent is only suspended while the impossibility continues. He argues that if performance was impossible from March to June 2020, the district court erred by failing to suspend the lease payments during that period. But Motter never requested this relief below, so he has not preserved error on this issue for appeal. *Dolly Invs.,* 984 N.W.2d at 174–75.

Regardless, the record supports the trial court's finding that impossibility or frustration of performance was both temporary and partial. The emergency proclamations did not prohibit restaurants from serving food or beverages. They only prohibited in-person dining. Restaurants could serve food and beverages

through carry-out, drive-through, and delivery services. While these limitations may have made Ghost Loungz less profitable, they did not preclude Ghost Loungz from operating or substantially frustrate its purpose as a "full service restaurant and lounge providing food and beverages."[2] Ghost Loungz's duty to perform and Motter's personal guaranty of performance are not excused.

In the alternative, Motter contends he was released as guarantor when Club 525 signed the lease assignment. The lease assignment agreement states that it is between Ghost Loungz, as assignor, and Club 525, as assignee. The original lease signed by Ghost Loungz and ATC is attached, and the lease assignment agreement states that it is "fully incorporated herein as though fully set forth" with certain changes. For instance, the section addressing the term of the lease "is replaced in its entirety" by language stating that the term is for three years, eight months, and eleven days, beginning on February 19, 2020, and terminating October 31, 2023, "unless terminated sooner hereunder." The section setting out the amount of rent is replaced with a provision that charges $1000 less per month from July 1, 2020, to October 31, 2020. The section concerning notices and

---

[2] To the extent that Motter argues partial performance was impossible because the renovations required to open Ghost Loungz were incomplete when the first proclamation took effect and the pandemic made their completion temporarily impossible, the record does not bear this out. Motter testified that when the first proclamation went into effect on March 26, 2020, "we continued to do the remodel/renovations. We were still going through with all of that." No other evidence was presented to support this claim.

To the extent that Motter argues partial performance was impossible because the restaurant was not open and did not have established customers before the pandemic, no evidence was presented to support the claim. Ghost Loungz never attempted to provide food for take-out or delivery. Any claim of impossibility of partial performance is speculative.

payments lists ATC as landlord, Club 525 as tenant, and Mason and Aquino as guarantors.

The district court found that the lease assignment agreement "is really a sub-lease" rather than an accord and satisfaction of Ghost Loungz's lease. "Accord and satisfaction is a means of discharging a contractual obligation by agreement of the parties to render and accept a different and substituted performance as full satisfaction of the preexisting claim." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 290 (Iowa 2017) (citation omitted). "An accord and satisfaction may be effected by paying money, doing an act, or giving a promise, *provided the thing paid, done, or given is not something to which the creditor was already entitled*." *Id.* (emphasis added) (citation omitted). "It is a new contract substituted for an old contract, which is thereby discharged, or for an obligation or cause of action which is settled. It must have all of the elements of a valid contract." *Robinson v. Norwest Bank*, 434 N.W.2d 128, 130 (Iowa Ct. App. 1988).

Motter has the burden of proving the defense of accord and satisfaction. *DuTrac*, 893 N.W.2d at 290. "Whether there is accord and satisfaction ordinarily involves a pure question of intention." *Hengesteg v. N. Eng'g, Inc.*, 478 N.W.2d 307, 309 (Iowa Ct. App. 1991).

> Both debtor and creditor must intend the substituted consideration is an accord and satisfaction of a preexisting claim. Proof of the required intent may include the agreement itself, the parties' words or actions, and the surrounding circumstances. The creditor's intent is established if it is shown she knew or should have known the substituted consideration was intended as an accord and satisfaction.

*In re Est. of Buss*, 577 N.W.2d 860, 862 (Iowa Ct. App. 1998) (internal citation omitted).

The district court noted that "whether an accord and satisfaction occurred rests on whether ATC intended to accept the new guaranty in place of Motter and Mason's guaranty." On this issue, it noted that

> the owner/manager of ATC, Nancy Wilson, specifically denied that ATC intended to release either personal guaranty when it entered into the lease assignment. Motter was not a part of the lease assignment nor was he even aware of it, so he is hard pressed to counter Ms. Wilson's assertion. Again, Motter bears the burden of proving accord and satisfaction. The Court concludes Motter has failed to do so. Nor is there any credible evidence to support a finding that ATC intended to abandon the guaranty obligations made by Mason and Motter when it signed the lease assignment.

Substantial evidence supports the district court's finding.

Finally, Motter contends that the settlement agreement between ATC and Club 525 releases ATC's claims against him. He cites paragraph 9 of the settlement agreement, which states, "The consideration made above fully resolves all claims held by each of the Parties hereto. There shall be no new proceedings concerning any of the claims that have been released as they relate to the Parties hereto." But the settlement agreement applies to the dispute between ATC and Club 525, not the dispute between ATC and Ghost Loungz. Motter was not a party to the settlement agreement, and it does not release Motter as guarantor of Ghost Loungz's performance under the lease.

We affirm the district court on Motter's claims related to the award of damages to ATC for breach of contract.

**2. Conversion.**

Motter contends that ATC wrongfully converted the $22,000 that Ghost Loungz paid as security deposit and first month's rent by using those funds toward Club 525's security deposit and rent rather than returning the money to Ghost Loungz.

The payment of the security deposit and the conditions on which ATC must return it is governed by paragraph 5 of the lease agreement. That paragraph requires Ghost Loungz to pay $22,000 at the time of the signing of the lease, of which $11,000 will be applied to the first month's rent and $11,000 will be held as security deposit for Ghost Loungz's "faithful performance" of the lease. It also states that if Ghost Loungz

> defaults with respect to any provision of this Lease, including, but not limited to the provisions relating to the payment of Rent[,] Landlord may (but shall not be required to) use, apply or retain all or any part of this security deposit for the payment of any Rent or any other sum in default . . . . If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the security deposit, or any balance thereof, shall be promptly returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) following expiration of the Lease. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest and shall have no further liability with respect thereto.

"Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Ezzone v. Riccardi*, 525 N.W.2d 388, 396 (Iowa 1994). To succeed on his conversion claim, Motter must show (1) his ownership or other possessory right in certain property exceeded ATC's, (2) ATC exercised "dominion or control" over the property inconsistent with his possessory right in it, and (3) he suffered

damages as a result. *See Larew v. Hope L. Firm, P.L.C.*, 977 N.W.2d 47, 60 (Iowa 2022) (citation omitted). But "no conversion claim exists where the dispute arises solely out of contractual obligations." *Id.* at 63. Because Motter's claim that ATC had to return the $22,000 is tied to the contract dispute, we deny his claim.

### 3. Attorney Fees.

Finally, Motter asks that we reverse the award of ATC's attorney fees. His argument depends on this court denying ATC recovery on its breach-of-contract claim. Because we affirm ATC's breach-of-contract claim on appeal, we affirm award of ATC's trial attorney fees under the parties' contract.

### B. ATC's Cross-Appeal.

ATC cross-appeals. It challenges the amount of damages the district court awarded for Ghost Loungz's breach of the lease. It also requests an award of appellate attorney fees.

### 1. Damages.

ATC contends the court erred by failing to award it $120,250. ATC believes this is the full amount of unpaid rent owed by Ghost Loungz minus the damages it mitigated by securing replacement tenants. But the district court found Ghost Loungz only owed ATC $109,250 in unpaid rent. It arrived at this figure based on its interpretation of the lease. ATC argues the court erred in its interpretation.

The lease agreement states:

> **4. RENT AND ADDITIONAL RENT.** All rent is payable in advance and the rents shall be absolutely payable without offset, reduction or abatement for any cause, except as otherwise expressly provided herein. . . .
> Tenant agrees to pay Rents as follows:
> i. February 19, 2020 – April 30, 2020    $0
> ii. May 1, 2020 – October 31, 2020    $11000

iii. Beginning November 1, 2020 through February 28, 2021 and each subsequent year in the months of November through February, rents shall be $9000, payable on the first of each month.
iv. Beginning March 1, 2021 through October 31, 2021 and each subsequent year in the months of March through October, rents shall be $11,000, payable on the first of each month.

**5. INITIAL PAYMENT AND SECURITY DEPOSIT.** At the time of the signing of this Lease, Tenant shall make payment of twenty-two thousand dollars ($22000). Eleven thousand dollars ($11000) to be applied to payment of first month's Rent (April, 2020) and eleven thousand dollars ($11000) to be held as security deposit . . . .

The district court held that ATC was only entitled to $109,250 in damages for the breach of contract because the terms of the lease were ambiguous regarding the amount of rent owed:

A fair reading of [paragraph 4] would be that no rent was due for April of 2020.

In contrast, paragraph 5 speaks of the first month's rent being due for April 2020. This would seem to suggest that the amounts paid by Ghost Loungz at the time the lease was signed included payment of April rent. The parties offered conflicting testimony as to their understanding as to when the first month's rent payment was due under the lease. . . .

. . . .

After applying the[] legal principles to the term of the contract at issue, that being when the first month of rent was due, the Court concludes that the meaning of this term is ambiguous as a matter of law given the plausible alternate readings of the language of the lease agreement. Consequently, the Court must determine the parties' intent as a question of fact. When it considers the evidence presented on this point, the Court concludes that the credible evidence established that the first month's rent payment was not due until May 1, 2020. Consequently, ATC is only entitled to a judgment against Ghost Loungz LLC and Motter for $109,250.

ATC contends the district court erred by interpreting the lease as not requiring the first rent payment until May 2020, citing the lease agreement and its owner's testimony at trial that "rent would commence April 1."

The cardinal rule of contract construction is that except in cases of ambiguity, the parties' intent controls. *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997). We determine the parties' intent from "the terms of the lease, what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the lease." *Id.*

The language of the contract is reasonably open to two interpretations. "When there are ambiguities in the contract, they are strictly construed against the drafter." *Id.* The district court did not err in construing the contract against ATC to find the first payment was not due until May 2020. We affirm the award of $109,250 in damages on ATC's breach-of-contract claim.

**2. Appellate Attorney Fees.**

ATC also requests an award of appellate attorney fees. Iowa Code section 625.22 states, "When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court." Paragraph 24 of the lease agreement states, "Tenant agrees to pay all attorneys' fees and other costs and expenses incurred by Landlord in enforcing any of Tenant's obligations under this lease." This provision allows the court to award appellate attorney fees. Because the record is insufficient for us to decide the matter on appeal, we remand for the district court to determine a reasonable award of appellate attorney fees.

**AFFIRMED AND REMANDED.**